# Commonwealth v. Gesslein

*Heather Gallagner*, for appellant.
*James Connell*, for appellee.

STEINBERG, *J.*, December 20, 2013—On April 4, 2013, a jury found the appellee, Andrew Gesslein, guilty of voluntary manslaughter.[1] No dispute exists that Andrew Gesslein, who was assigned as a security guard at the North End Republican Club (hereinafter club), shot and killed Michael Randolph. It is equally undisputed that Michael Randolph barged into the club after being denied admittance several times. Most of the other relevant facts, which will be discussed hereinafter are subject to dispute.

On May 24, 2013, the Commonwealth (hereinafter appellant) filed a notice of their intention to seek the five (5) year mandatory minimum sentence pursuant to 42 Pa.C.S. § 9712. On June 11, 2013, the appellee was sentenced to not less than sixty (60) months nor more than one hundred twenty (120) months in a state correctional institution. Various timely motions were filed by counsel for the appellee, including post sentence motions. Prior to the resolution of those motions, the Commonwealth filed a "motion for recusal." The allegations in that motion were debunked at a hearing held on September 3, 2013, after which it was denied. No appeal from that order was filed.

Following the recusal hearing, argument on the post sentence motions was held. Those motions were taken under advisement, and it was agreed that the decision on those motions could be extended pursuant to Pa.R.Crim.P. 720(B)(3)(b). On November 8, 2013, this court filed an opinion granting the appellee a new trial.

The appellant filed a notice of appeal on November 15, 2013. Pursuant to Pa.R.A.P. 1925(b), this court directed the appellant to file a concise statement of the

---

1. 18 Pa.C.S. § 2503(b) — Unreasonable belief killing justifiable.

errors complained of on appeal. On December 9, 2013, counsel for the appellant did so and alleged the following: (1) The "lower court abused its discretion in denying the Commonwealth's motion that it recuse itself prior to considering post-sentence motions based on the court's bias against the Commonwealth and victim...."; (2) "The lower court abused its discretion when it determined that the verdict was against the weight of evidence...."[2]

## Background

The events surrounding the death of Michael Randolph began in the early morning hours of April 29, 2012. Andrew Gesslein, who was employed as a private security guard for Eye in the Sky, arrived at the North End Republican Club at approximately 2:15 a.m.[3] This establishment was described as an after-hours club, which on this night had almost one hundred (100) people inside.[4] A large crowd had gathered at the back door, and Mr. Gesslein's responsibilities included permitting or denying entrance into the club. Entry into the club was to end at 3:00 a.m.

On this night, Mr. Gesslein's contract with Michael Randolph began at approximately 2:30 a.m. A video from the club security camera documenting the events outside the club was introduced into evidence by the Commonwealth.[5] The date and time stamped on that video is inaccurate, but it does depict the events leading up to Michael Randolph's death and the aftermath of his

---

2. Concise statement of matters complained of on appeal, ¶¶ 1-2.
3. Notes of Testimony, Trial (hereinafter N.T.T.), April 3, 2013, Vol. III, p. 100.
4. N.T.T., April 2, 2013, Vol. II, p. 182.
5. *Id.* at pp. 33-36; *See* Commonwealth's exhibit 25.

shooting.[6] Specifically, a reasonable interpretation of this video is that Michael Randolph was turned away from entering the club on multiple occasions, until he forced his way past security.

Mr. Randolph was denied permission to enter the club, according to Mr. Gesslein, based on an incident the night before in which he was screaming obscenities and swinging a beer bottle in Mr. Gesslein's direction.[7] When Michael Randolph arrived the next night, he was told that he would not be permitted to enter the club. Michael Randolph demanded to be allowed inside, and with each refusal, became more irate. "[H]is tone escalated and his verbal threats to me [Gesslein] to do severe bodily harm and kill me..."[8] Eventually, Michael Randolph "flung the door" out of Mr. Gesslein's hand, and with three of his friends, rushed through the door.[9] None of Michael Randolph's other friends were witnesses at the trial.

Mr. Gesslein's version of these events was corroborated by Lakera Kelley, a Commonwealth witness. On cross-examination, she admitted that she testified at the preliminary hearing that she heard threats hurled at Mr. Gesslein including, "I'll beat your ass, I'll shoot you."[10]

Once Michael Randolph thrust his way into the club, the events unfolded very rapidly. In order to decipher what happened, evaluating the testimony of the following witnesses becomes critical: (1) Andrew Gesslein; (2) Anthony Eric Jones; (3) Robert Smith, Jr.; (4) Lakera

---

6. *Id.* at pp. 49-50.
7. N.T.T., April 3, 2013, Vol. III, pp. 95-96.
8. *Id.* at p. 109.
9. *Id.* at p. 110.
10. N.T.T., April 2, 2013, Vol. II, pp. 115-116.

Kelley; (5) Miguel Gomes; (6) Detective Kevin Mriss; and (7) Dr. Rameen Starling-Roney. In that regard, the Commonwealth was only able to produce four (4) witnesses who were inside the bar at the time of the shooting from almost one hundred (100) who were present. Additionally, they only interviewed twenty-six (26) of them.[11]

The testimony of the four (4) citizen witnesses was, at times, inconsistent with each other, as well as the forensic evidence. Moreover, some of these witnesses denied witnessing the shooting. Mr. Smith, the president of the club, was one of those witnesses. He testified that immediately prior to the shooting, he was at a table near the entrance to the club. However, at the time of the shooting, he claimed to be on his way back to his office.[12] He heard two (2) shots.[13] However, Mr. Jones, a patron, heard Mr. Smith "yell" and then the "confrontation or tussle" occurred.[14] It was also Mr. Gomes's testimony that Mr. Smith was present when the events unfolded.[15]

Ms. Kelley entered the club and started walking towards the bar. She overheard arguing at the door, and as she approached the bar, heard three (3) gunshots.[16] She described those gunshots as "right behind [her]".[17] Ms. Kelley then ran out a side door on the other side of the club, and came around the building to the parking lot. She saw Michael Randolph on the ground and started CPR.

Mr. Jones, a club member, arrived at the club between

---

11. *Id.* at pp. 182-183; N.T.T., April 3, 2013, Vol. III, pp. 72-73.
12. N.T.T., April 2, 2013, Vol. II, pp. 91-92, 95, 99.
13. *Id.* at p. 92.
14. *Id.* at p. 80.
15. *Id.* at p. 144.
16. *Id.* at p. 106.
17. N.T.T., April 2, 2013, Vol. II, p. 106.

2:00 a.m. and 2:30 a.m., to meet some people. He seated himself "in the back of the club, which is pretty much by the kitchen door."[18] *See* Commonwealth's exhibit 12. It was his estimation that he was between ten (10) to fifteen (15) feet from the door. He overheard, but did not see, either a "scuffle," "argument," "tussle" or "fight" at the door between Mr. Gesslein, Mr. Randolph and Mr. Randolph's two (2) friends.[19] His attention was drawn to this confrontation by Mr. Smith's yelling.[20] At that point, he testified that he observed the "security guard" back up to the edge of the pool table.[21] He then drew his gun and fired three (3) shots while Michael Randolph and his friends were running out the door of the club.[22] He did not see Michael Randolph or his friends with a gun.[23]

The testimony of Detective Kevin Mriss demonstrates that the shells from Andrew Gesslein's weapon were recovered on the opposite side of the room from where Miguel Gomes states Andrew Gesslein was standing when he discharged his weapon. Detective Mriss identified three (3) shell casings which were located as follows: (1) the base of the pool table, closest to the exterior wall; (2) the garbage can, against that same wall; and (3) on the floor between the garbage can and recycling bin.[24] *See also* Commonwealth's exhibits 12-14, 16-17, and 20. Sergeant Kurt Tempinski, who was a member of the Pennsylvania State Police for over twenty-one (21) years as a firearm and tool mark examiner, tested Andrew Gesslein's .45

18. *Id.* at p. 68.
19. *Id.* at pp. 69, 75, 80, 82.
20. *Id.* at pp. 70, 78, 80.
21. *Id.*
22. N.T.T., April 2, 2013, Vol. II, pp. 70, 78, 80.
23. *Id.* at p. 72.
24. *Id.* at pp. 17-26, 30-31.

caliber semi-automatic firearm and other items, including the shell casings. According to his expert opinion, this weapon would eject its casings to the right and slightly to the rear if held in the traditional manner.[25]

Miguel Gomes arrived at the club shortly before closing and heard some of the argument between Andrew Gesslein and Michael Randolph. He was allowed in the club by the "owner" and as soon as he entered, he testified that Michael Randolph "walked in and he [Randolph] stood in front of the pool table."[26] Michael Randolph then put his hands up and exclaimed "I told you I was going to get in."[27] Mr. Gomes placed Andrew Gesslein by the bathroom, which as the photographs depict, is not near the pool table.

Mr. Gomes then claimed that Andrew Gesslein drew his gun and "got into a shooting form."[28] Michael Randolph and a friend then headed for the door at which point Andrew Gesslein fired his weapon "three or four" times.[29] All of the shots were fired, according to Mr. Gomes, while Michael Randolph was inside the club.[30] On cross-examination, Mr. Gomes denied that Andrew Gesslein and Michael Randolph had a physical altercation inside the bar.[31] He placed them approximately ten (10) feet apart at the time of the shooting and at locations unsupported by any other witnesses.

Dr. Rameen Starling-Roney, a forensic pathologist, performed the autopsy of Michael Randolph. It was his

---

25. N.T.T., April 2, 2013, Vol. II, pp. 161, 166.
26. *Id.* at p. 131.
27. *Id.* at pp. 131-132, 145.
28. *Id.* at p. 134.
29. *Id.* at p. 135.
30. N.T.T., April 2, 2013, Vol. II, p. 136.
31. *Id.* at pp. 141-142.

opinion that Michael Randolph received three (3) gunshot wounds. He labeled those wounds A, B and C, but made it clear that those labels did not reflect the order of the wounds.[32] One wound was to the right lower abdominal quadrant. The path of travel was "right to left, upward minimal back/front deviation."[33] A second wound was to the right side of the back. The path of travel was "right to left, back to front and upward."[34] A bullet was recovered from the soft tissues within the left shoulder. A third wound was to the upper portion of the right thigh. The path of travel "started at the posterior aspect of the right thigh, and then it went across the skin and soft tissues.... It came out...on the middle of the right thigh...the wound path continues via another entrance wound right across on the left thigh...and then exited...the side of the left thigh."[35] Dr. Starling-Roney, while cautioning that all gunshots are potentially lethal, concluded that the wound to the back was "rapidly fatal."[36]

Various questions were asked of Dr. Starling-Roney in an attempt to position both Andrew Gesslein and Michael Randolph at the time of the shooting. However, Dr. Starling-Roney prefaced the hypotheticals presented by stating that he was unable to "say where anybody was based on [his] autopsy."[37] Thereafter, the prosecutor positioned himself in various ways which are poorly reflected in the transcripts.[38] What is reflected is that the "shooter" was on the right side of the "victim." Additionally, Dr. Starling-

---

32. N.T.T., April 3, 2013, Vol. III, pp. 27-28.
33. *Id.* at pp. 43-44.
34. *Id.* at p. 35.
35. *Id.* at pp. 38-39.
36. *Id.* at p. 46.
37. N.T.T., April 3, 2013, Vol. III, p. 48.
38. *Id.* at pp. 50-57.

Roney found that it "would be difficult" for a wound to the abdomen to have occurred with the victim standing and facing the shooter.[39] On cross-examination, Dr. Starling-Roney testified that "there is definitely a potential for a sideways, for being sideways" at the time of the wound to the abdomen.[40]

Two interviews were conducted with Andrew Gesslein the morning after the shooting.[41] One commenced at 8:20 a.m. and ended at 9:15 a.m. The second began at 9:52 a.m. and ended at 10:15 a.m. During those interviews, he reviewed the events of the shooting with the detectives. Two mistakes became evident in his recollection: 1) Three (3) shots, not two (2) shots, were fired; and 2) the shooting took place inside the club, not outside. Following the shooting, Andrew Gesslein remained under the auspices of the Allentown Police Department for over seven (7) hours. Thereafter, he was released until his arrest on June 7, 2012.

Andrew Gesslein testified in his own defense. He recounted, as previously described, the events leading up to the shooting. He also described the shooting of Michael Randolph. At approximately 3:00 a.m. Miguel Gomes was allowed in the club. "When that had happened, Mr. Randolph flung the door out of my [Andrew Gesslein] hand, him and his three friends that he was with bum rushed through the door...A quick Blitz....They just — the four of them just ran right into the doorway, flung the door open and ran in... I put my arms out in a T-motion and tell them "Guys, you gotta get out'.... Mr. Randolph

---

39. *Id.* at. p. 55.
40. *Id.* at p. 61.
41. *See* Commonwealth's exhibit 30.

grabbed my right arm; he started on my forearm, locked down on my wrist. The other gentlemen grabbed my left arm, grabbed me by my fleece, tried doing what I call the hockey maneuver.... Punched me on the left side of my head and now I'm fighting."[42] He then described how he extricated himself from Michael Randolph and backed up. He testified that he was scared. "You know, you got two — two young men that are grabbing your arms and they're whacking you, they're beating on you...."[43] He backed up to the end of the pool table and saw "Mr. Randolph taking his right hand reaching into the front of his waistband.... When he reached into his waistband, as his hand was coming up, I seen the black handle of a firearm. I was not going to worry about getting shot first, I drew my weapon and — that's why we're here.... I seen a firearm, I knew I was going to die. I drew my gun, I shot first."[44]

## Discussion

### Weight of the Evidence

The decision to grant a new trial because a jury's verdict is against the weight of the evidence is done with the recognition that the judgment of the jury is entitled to considerable respect. However, as stated in *In re Winship*, 397 U.S. 358, 364 (1970), discussing the reasonable doubt standard, "[i]t is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. It is also important in our free society that every individual going about his ordinary affairs have confidence that

---

42. N.T.T., April 3, 2013, Vol. III, pp. 110-113, 168, 171-176.
43. *Id.* at p. 115.
44. *Id.* at. pp. 116-118.

his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *Id.*

Here, this court, after canvassing the record and weighing the evidence,[45] has reached the conclusion that the verdict was "against the weight of the evidence". In other words, the continued viability of the judgment against Andrew Gesslein would constitute a manifest denial of justice.[46]

It has often been said that "[a] motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has [also] been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Clay*, 64 A.3d 1049, 1054-1055 (Pa. 2013) (internal

---

45. *See Baxter v. Fairmont Food Co.*, 379 A.2d 225, 230 (N.J. 1977) ("[T]he process of evidence evaluation called 'weighing' is not 'a pro forma exercise, but calls for a high degree of conscientious effort and diligent scrutiny. The object is to correct clear error or mistake by the jury.").

46. *Risko v. Thompson Muller Automotive Group, Inc.*, 20 A.3d 1123, 1133 (N.J. 2011) ("A 'miscarriage of justice' has been described as a 'pervading sense of 'wrongness' needed to justify [] a trial judge undoing of a jury verdict...[which] can arise...from manifest lack of inherently credible evidence to support the finding, obvious overlooking or underevaluation of crucial evidence, [or] a clearly unjust result....'").

quotations and citations omitted). Appellate courts will give the "gravest consideration to the findings and reasons advanced by the trial judge" when reviewing this claim "[b]ecause the trial judge has had the opportunity to hear and see the evidence presented." *Id. See also Commonwealth v. Trippett*, 932 A.2d 188, 198 (Pa. Super. 2007) ("[W]here the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim") (internal citation omitted).

Likewise, it has been explained that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." *Id.* quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000). This discretion, as explained above, is not "unfettered" and its limits have been explained as follows:

> The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Id. See also in the Interest of J.B.*, 69 A.3d 268, 277-278 (Pa. Super. 2013); *Commonwealth v. Dickerson*, 757 A.2d 404 (Pa. Super. 2000).

The Commonwealth in this case was not only required to prove the elements of voluntary manslaughter, but also had the burden of disproving Andrew Gesslein's self-defense claim beyond a reasonable doubt. *Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012). The Commonwealth sustains the burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him] self therefrom; or that the slayer violated a duty to retreat or avoid the danger." *Id.* at 740-741. It was the Commonwealth's contention that Andrew Gesslein did not reasonably believe that he was in imminent danger of death or great bodily harm. As stated in *Mouzon*, "[t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant 'must have acted out of an honest, bona fide belief that he was in imminent danger,' which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis." *Id.* at 752.

No reasonable person could argue that Michael Randolph was not aggressive in both manner and deed toward Mr. Gesslein. He forced his way into the club

after he directed threats at Mr. Gesslein because he was not permitted admission into the club. It is similarly evident that Mr. Gesslein's use of deadly force was dependent on whether Michael Randolph had a firearm, and reached for it during their confrontation. However, to paraphrase Justice Oliver Wendall Holmes, Jr., "[d]etached reflection cannot be demanded in the presence of an uplifted [gun]." *Brown v. United States*, 256 U.S. 335, 343 (1921); *Commonwealth v. Soto*, 657 A.2d 40, 41 (Pa. Super. 1995) (A court must be careful not to examine the reasonableness of a defendant's belief with 20/20 clarity of hindsight).

The focal point of the Commonwealth's evidence is that no firearm was recovered from the body of Michael Randolph by the police. Sergeant Alicia Conjuor was one of the initial officers who responded to the club after the shooting. She observed Michael Randolph on the ground at the foot of the stairs to the door of the club. A large crowd had gathered in the parking lot behind the club, which she described as "generally hostile to the police."[47] Police personnel were needed to "get the crowd back" so EMS could provide assistance to Mr. Randolph.[48] Her entire shift responded which included fourteen (14) other officers.[49] She encountered no cooperative witnesses, and her inquiries were met by "expletives."[50]

Two equally reasonable and mutually inconsistent inferences can be drawn from these set of circumstances. Michael Randolph either did not possess a firearm,

---

47. N.T.T., April 1, 2013, Vol. I, p. 79.
48. *Id.*
49. *Id.* at pp. 83-84.
50. *Id.* at pp. 80-81, 84.

or in the morass of hostility, the firearm was spirited away. "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses may result in depriving a defendant of his life or his liberty." *Commonwealth v. Woong Knee New*, 47 A.2d 450, 468 (Pa. 1946); *Commonwealth v. Gruff*, 822 A.2d 773, 788 n. 12 (Pa. Super. 2003); *Commonwealth v. Johnson*, 818 A.2d 514, 521 (Pa. Super. 2003) ("When a party on whom the burden of proof rests in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither").

An inference is an operation of logic that enables a fact to be found without direct proof of that fact. *Bernstein*, 2012 Pa. Rules of Evidence, Comment 5 to Pa.R.E. 401. The Commonwealth's inference is not only crippled by an "equally reasonable and mutually inconsistent inference," but by the absence and quality of witnesses to support it.

None of Michael Randolph's "friends" who bolted inside the club were presented as witnesses. Furthermore, the testimony of Miguel Gomes can only be characterized as a fabrication. The shell casings from Andrew Gesslein's firearm were found on the opposite side of the room from where Mr. Gomes placed Andrew Gesslein. Additionally, almost all of the Commonwealth's other witnesses depicted some type of confrontation between Andrew Gesslein and Michael Randolph inside the club, except Miguel Gomes. Mr. Gomes would only say, when asked on cross-examination, that outside the club, Michael Randolph was heard exclaiming "[w]e should fuck him up."

Andrew Gesslein provided the most detailed testimony concerning the confrontation inside the club, but corroborating testimony was also provided by Anthony Jones[51] and Robert Smith, although Smith's testimony regarding his location at the time of the shooting was contradicted by other witnesses.[52] Lakera Kelley, who knew Michael Randolph, heard the threats outside the club, and the gunshots in the club. Her testimony neither supported nor refuted the Commonwealth's theory. Mr. Gomes is the only witness who denied that a physical altercation preceded the shooting.[53] He is also the only witness who testified that after Michael Randolph entered the club, he raised his hands and said "I told you I was going to get the "f" in,"[54] and moments later from a distance of ten (10) feet away, Andrew Gesslein shot him.[55]

The testimony of Miguel Gomes is subject to the "incontrovertible physical facts rule." *Commonwealth v. Newman*, 470 A.2d 976, 978-979 (Pa. Super. 1984). This rule, which dated back to *Lamp v. Pennsylvania R.R.*, 158 A.269 (Pa. 1931), holds that "where the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted, it being either mistaken or false, and a verdict based on it will not be sustained." *Id. See also Commonwealth v. Santan*, 333 A.2d 876, 878 (Pa. 1975). Based on the recovery of shell casings, the events as retold by Mr. Gomes were a work of fiction. *See Commonwealth v. Farquharson*, 354 A.2d 545, 550 (Pa. 1976) ("[T]here may be some legitimacy

---

51. N.T.T., April 2, 2013, Vol. II, pp. 69-75, 80-83.
52. *Id.* at pp. 97-99.
53. N.T.T., April 2, 2013, Vol. II, pp. 141-142.
54. N.T.T., April 2, 2013, Vol. II, pp. 132-134.
55. *Id.* at pp. 134-135, 145.

for a trial court, who has also observed the witnesses as they testimony, to consider the weight of the evidence and to that extent review the jury's determination of credibility....").

The Commonwealth also cannot meet their burden of proof with the testimony of Robert Smith and Lakera Kelley. Both of them claimed to have had their backs to the events culminating in the shooting. Lakera Kelley did not see Michael Randolph with a gun, but she did not frisk him or look for a gun. The only witness throughout the entire trial that modestly supports some of the Commonwealth's theories is Anthony Jones, and by his own admission, he paid little attention to what was happening at the door until he heard "Mr. Smith yell something."[56] he claimed to overhear what he interchangeably called a "scuffle," "argument," "fight," "confrontation" or "tussle."[57] He was "seated in the back of the club,"[58] approximately ten (10) to fifteen (15) feet away talking to his friends. When Mr. Smith yelled, he observed the security guard back up to "the edge of the pool table."[59] "And at that point is when he drew his gun and fired three shots."[60] Mr. Jones, who knew Mr. Randolph as "O-Head," testified that the shots were fired as Mr. Randolph and "his friends" were running out the door.[61] He did not see Michael Randolph either reach for or in possession of a gun,[62] but he did see them "running and looking back."[63] He also remembered

---

56. *Id.* at p. 78.
57. *Id.* at pp. 69-70, 75, 80-82.
58. N.T.T., April 2, 2013, Vol. II, p. 68.
59. N.T.T., April 2, 2013, Vol. II, p. 70.
60. *Id.*
61. *Id.* at p. 71.
62. *Id.* at p. 72.
63. N.T.T., April 2, 2013, Vol. II, p. 72.

approximately ten (10) people at the door immediately before the shooting. Mr. Jones' testimony neither proves nor disproves Andrew Gesslein's version of events. He was ten (10) to fifteen (15) feet away, with other patrons in-between, and observed only a few seconds of whatever happened.

The Commonwealth is entitled to rely upon inferences that may be drawn from circumstantial evidence, but there are limitations. "Viewed as a whole, the "evidentiary threads' must be sufficient to 'lift [the] contention out of the realm of speculation.'" *Fitzpatrick v. Natter*, 961 A.2d 1229, 1241 (Pa. 2008); *Commonwealth v. Wiley*, 432 A.2d 220 (Pa. Super. 1981). In that regard, "[a] true "weight of the evidence' claim contends the verdict is a product of speculation or conjecture." *Commonwealth v. Dougherty*, 679 A.2d 779, 785 (Pa. Super. 1996).

A close inspection of the Commonwealth's "evidentiary threads" finds them unraveling. It is comprised of witnesses who either saw nothing, or could not have witnessed what they claimed. Expert testimony, which is unquestioned as to cause and manner of death, is speculative as to the position of the two antagonists. The forensic pathologist made it clear that he was unable to position anyone based on his autopsy, but then provided such testimony when confronted with the hypotheticals and the gyrations of counsel. The most compelling evidence is that no one saw Michael Randolph with a gun with the exception of Mr. Gesslein, and a gun was not recovered. However, even that evidence is diluted by the crowd that surrounded his body and the ease to which the gun could have been removed. Moreover, if he possessed a gun, it was secreted and literally only visible for seconds.

Mr. Gesslein's version of events is substantially corroborated by the Commonwealth's evidence, and is more compelling. The video outside the club demonstrates Mr. Randolph's aggressive actions up to and including his blitz into the club. Commonwealth witnesses also support Mr. Gesslein's testimony that Mr. Randolph was hurling invectives. Moreover, the gunshot to Mr. Randolph's "right lower abdominal quadrant" is consistent with where Mr. Gesslein testified that Mr. Randolph reached for the "black handle of a gun."[64]

It is well established that, in judging Mr. Gesslein's credibility, a jury may consider that he has a "vital interest in the outcome of the trial." *See* Pennsylvania Suggested Standard Jury Instructions (Criminal) 3.09 (2012); *United States v. Jones*, 372 F.App'x 343 (3d Cir. 2010); *United States v. Gaines*, 457 F.3d 238, 244-245 (2d Cir. 2006); *Taylor v. United States*, 390 F.2d 278, 285 (8th Cir. 1968)(Blackmun J.). However, it is equally true that a defendant's testimony "should not [be] disbelieve[d]... merely because he is the defendant." Pennsylvania Suggested Standard Jury Instructions (Criminal) 3.09 (2012). *See Commonwealth v. Lesko*, 15 A.3d 345, 397 (Pa. 2011); *Commonwealth v. Harley*, 418 A.2d 1354, 1359 (Pa. Super. 1980); *Commonwealth v. Frye*, 414 A.2d 1077, 1079-1080 (Pa. Super. 1979); *see also United States v. King*, 485 F.App's 588, *2 (3d Cir. 2012); *Commonwealth v. Pipes*, 27 A.839 (Pa. 1893) (it is error for the court to charge in a criminal case as will tend to lead the jury to disregard the defendant's evidence or to minimize it).

---

64. Notes of Testimony, Testimony of Andrew Gesslein, II (hereinafter N.T.A.G.), April 3, 2013, p. 117.

The decision to grant a new trial in this case is the product of truly extraordinary circumstances, including the Commonwealth's decision to rely upon Miguel Gomes, a witness whose motives are unknown, and whose testimony was intentionally distorted. It is not because of a mere conflict in testimony or because on the same facts this court would have arrived at a different conclusion. *Renna v. Schadt*, 64 A.3d 658, 670 (Pa. Super. 2013).[65] Instead, this is a case in which the "verdict is so contrary to the evidence as to shock [this court's] sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *See Clay* 64 A.3d at 1055; *In re J.B.*, 69 A.3d at 277.[66]

Motion For Recusal

The Commonwealth, in their recusal motion, made various allegations in an attempt to publicly bully this court from deciding the post-sentence motions. None of the pretrial or trial rulings of this court were the subject of the motion, nor is it alleged that some sentence other than the mandatory minimum sentence should have been imposed. In that regard, the mandatory minimum sentence was a standard range sentence which was consistent with the sentence the Commonwealth requested.[67] In fact, the

---

65. "For the highest exercise of judicial duty is to subordinate one's personal pulls and one's private views to the law of which we are all guardians those impersonal convictions that make a society a civilized community, and not the victims of personal rule." Felix Frankfurter, in Clark, Tom C., "Mr. Justice Frankfurter; 'A Heritage for All who Love the law,'" 51 A.B.A.J. 330, 332 (1965).

66. To paraphrase Baxter, supra. at 230, the conclusion reached by this court involves the reaction of a trained judge who in light of his judicial and human experience is a definite conviction that the jury "went so wide of the mark," a mistake was made by the jury.

67. Notes of Testimony, Recusal/Post-Sentence Motions hearing (hereinafter N.T.P.S.M.), September 3, 2013, pp. 10, 11.

Commonwealth conceded at the recusal hearing that they were unable to point to even one example in the trial which would support the recusal motion.[68]

Instead, the appellant's motion contains allegations regarding appellee's presentence report,[69] and the disclosure by this court to counsel of information regarding a potential discovery violation committed by the Commonwealth.[70] However, those allegations mask the true crux of the motion, which were comments made by this court at sentencing.[71]

The appellant alleged that this court "directed" the presentence investigator not to make a sentencing recommendation, and to "watch rap music videos produced by the victim...."[72] However, testimony from two (2) probation officers at the recusal hearing demonstrated that the allegations regarding the presentence report had no merit. In fact, the inclusion of those allegations in the motion suggests that the appellant failed to conduct a good faith investigation prior to filing their motion.

The testimony revealed that the chief adult probation officer for Lehigh County conducted an investigation at this court's request after the Commonwealth's motion was filed. He found no evidence to support the Commonwealth's claims regarding the presentence report.[73] The presentence investigator, Cynthia Quadro, also testified and confirmed that the presentence report was completed by her without

---

68. *Id.* at p. 9.
69. Motion for recusal, ¶¶ 8-10.
70. Motion for recusal, ¶¶ 4-7.
71. Notes of Testimony, Sentencing (hereinafter N.T.S.), June 11, 2013, pp. 43-49.
72. Motion for recusal, ¶ 9.
73. N.T.P.S.M. at pp. 15-16.

any outside interference.[74] Even so, she admitted to speaking with the prosecutor and this court prior to its completion.[75] She testified that she was not directed to watch any videos nor was she directed to refrain from making a recommendation in the presentence report.[76]

The presentence report is designed to include "information regarding the circumstances of the offense and the character of the defendant sufficient to assist the judge in determining sentence." Pa.R.Crim.P. 702(A)(3). The "essential and adequate elements" of a presentence investigation report have been well-documented. *Commonwealth v. Goggins*, 748 A.2d 721, 728-729 (Pa. Super. 2000). *See also Commonwealth v. Carrillo-Diaz*, 64 A.3d 722, 726 (Pa. Super. 2013). A sentencing recommendation is not required nor is it binding on the sentencing court.[77] Furthermore, "[a] sentencing judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come."[78] *Commonwealth v. Broadie*, 489 A.2d 218, 221 (Pa. Super. 1985) quoting *Commonwealth v. Schwartz*, 418 A.2d 637, 640-641 (Pa. Super. 1980). Here, no erroneous information was contained in the presentence report nor was information outside the record used by this court in sentencing the appellee. Moreover, the information available to the presentence investigator in preparation of the report is not limited to the Commonwealth's

74. *Id.* at pp. 22-23.
75. *Id.* at pp. 25-26.
76. *Id.* at pp. 27-30.
77. N.T.P.S.M. at p. 13.
78. Sentencing courts may consider evidence that might not be admitted at trial. *Commonwealth v. Charles*, 488 A.2d 1126, 1129 (Pa. Super. 1985).

perspective regarding the facts and circumstances. It is intended to provide the sentencing court with "sufficient information to enable him [or her] to make a determination of the circumstances of the offense and the character of the defendant." *Goggins*, 748 A.2d at 729. The presentence investigator's complete understanding of the facts and circumstances assists in the preparation of a meaningful report for sentencing. Finally, it is difficult to understand this argument in light of the mandatory nature of the sentence coupled with the Commonwealth's agreement with the length of the sentence.

The appellant has also made two interrelated, but vague claims regarding information about a potential *Brady* violation[79] that was disclosed to both counsel prior to sentencing. The appellant finds fault with this court's discovery of information after the "trial and verdict," and the words used by this court to disclose the information uncovered. With respect to this latter point, the recollection of this court and defense counsel differed with the prosecutor's rendition of events. The Commonwealth contended that upon disclosure, this court told defense counsel to "check it out." Defense counsel's recollection about the conversation was that he believed he was the one who said "I'll check it out."[80] The overall synopsis of the conversation was that the information concerning the potential *Brady* violation was disclosed because of this court's "ethical obligation to disclose it so Mr. Connell [defense counsel] could investigate those claims."[81]

The only testimony regarding the *Brady* violation came

---

79. Motion for recusal, ¶¶ 4-7.
80. N.T.P.T.S. at pp. 47-48.
81. *Id.* at pp. 46-50.

from Assistant Chief Joseph Hanna of the Allentown Police Department, the agency that prosecuted the appellee. Following the trial, he was contacted by this court about "an allegation or a rumor that there may have been some information, expert testimony or an expert report that had not surfaced or been disclosed during the trial."[82] Assistant Chief Hanna spoke with the police prosecutor, Detective Andrew Hackman, and learned that "there was a cursory conversation with a former Allentown police officer, Athanasios Milios, who teaches Act 235 at Lehigh County Community College."[83] He was also described as a "Public Safety Training Specialist."[84] Assistant Chief Hanna reported his findings to this court, which were ultimately disclosed to counsel.[85]

The most obvious answer to this post verdict recusal claim is that no acquired information resulted in any ruling in this case. Furthermore, this information, which was acquired after the verdict, was disclosed to counsel prior to sentencing. Caution dictated making a limited inquiry to determine if the information was an unsubstantiated rumor. *See United States v. Siegelman,* 799 F.Supp.2d 1246 (2011) ("Although better practice would have been for district judge not to receive, prior to hearing on motion to reconsider...ex parte communications from Postal Inspection Service and Marshals Service representatives regarding ongoing investigation into copies of e-mails purporting to reflect communications among jurors while trial was in progress...neither new trial nor recusal was warranted on such basis, where the

---

82. *Id.* at pp. 41-42.
83. *Id.* at p. 42.
84. *Id.* at pp. 42-43.
85. N.T.P.T.S. at p. 43.

judge decided the motion on basis of the record properly before him, ignoring the extrinsic information"). The receipt of extrinsic information by judges was explained in *Siegelman* as a hazard of the job. "[J]udges routinely receive extrinsic information from other sources for other reasons. A judge should minimize, but cannot wholly avoid, such occurrences. Every judge lives in a community and presides over multiple cases. That a judge might receive information in connection with the judge's other duties, without the parties' knowledge, should come as no shock. Nor should it come as a shock that the information will sometimes be relevant to an issue in a case. When this occurs, the judge must decide the issue without considering the extrinsic information in any way. Doing this is second nature to any judge who has long served." *Id.* at 1257. Here, the receipt of information by the court did not prejudice anyone. It had no effect on any proceeding or ruling in the case, and it was disclosed to counsel. To paraphrase *Siegelman*, the appellant's contention has "all the earmarks of an eleventh-hour play based upon... dissatisfaction with the [judge's comments]." *Id.* at 1262.

Finally, the appellant in their motion objects to comments made by this court prior to the imposition of the five (5) year mandatory minimum sentence on the appellee. Some of their objections, such as permitting the appellee to hug his family before leaving with the sheriffs to commence his sentence border on nonsensical, and deserve no further comment.

The actual comments which are set-out completely in the sentencing transcript may be interpreted as critical of both the prosecution and Michael Randolph. However, that does not translate into a finding that a judge cannot be fair

and impartial. The comments help to explain why a more severe sentence was not appropriate, and dispel the picture that Michael Randolph "had just turned the corner in his life" and was "on his way to...being the model citizen...."[86] It is ironic that the Commonwealth finds fault with critical comments pointed in their direction, but has no qualms with a judge excoriating the conduct of a defendant.

The recusal motion contained selective portions of this court's statements, including editorial comments. The actual comments, which are only a portion of the entire statement, are the following:

THE COURT: Okay. I don't think I'm going to be as kind as both the Commonwealth attorney and defense attorney has (sic) been. Occasionally, a judge has to get things off his chest as well. This is my opportunity to get things off my chest. I reviewed the presentence report. I've considered the sentencing guidelines in this matter. I've listened to the testimony of witnesses from both sides here today.

I've read all the letters written in support of Michael Randolph and likewise, in support of Andrew Gesslein. I've been a defense attorney; I've been a prosecutor; I've been a judge. I can't remember a case that has distressed me as much as this case has distressed me.

Dr. King said, "Injustice anywhere is a threat to justice everywhere." That's for the nonlawyers here. For the lawyers in the courtroom, the verdict borders on shocking my sense of justice. For the public at large, I'll say now publicly what I have said privately: That

---

86. N.T.S. at pp. 11-12.

if this shooting involved a police officer, Mr. Gesslein, you never would have been charged.

I can't say what happened in the North End Republican Club in the moments leading up to Michael Randolph's death, partly because of the dearth of witnesses from inside the club who testified. Approximately a hundred people inside the club, friends of Michael Randolph, and the Commonwealth was only able to muster four people to testify from inside the club. Two of those witnesses, quite frankly, whose credibility was extremely doubtful to this court.

The two people involved in this shooting could not be more different. I think it's important to understand that the portrayal of Michael Randolph and the portrayal of Andrew Gesslein is from their family and departs from the reality of the situation.

It's tragic that a life was lost, but as the district attorney, Mr. Luksa, said in his closing, Michael Randolph bears some responsibility here, and he does. He was described as an aspiring rapper. He has a prior criminal history that includes as juvenile adjudications: robbery of (sic) two counts; committed to Youth Forestry Camp No. 3 — and I'm going through the felonies — possession with intent to deliver a controlled substance; adjudicated delinquent; committed to Southwest Secure Treatment Unit.

As an adult in 2009: adjudicated delinquent — excuse me — convicted; possession with intent to deliver a controlled substance; sentenced to time served to 24 months, less one day; immediate parole to Northampton

county detainer.

So let's not say that Michael Randolph was this wonderful citizen because he was not. His rap lyrics which, Mr. Luksa and Mr. Connell, we had the opportunity to review, glorified drug use, violence. Michael Randolph forced his way inside the North End Republican Club while under the influence of alcohol and drugs. I was going to say something about the likelihood of Michael Randolph succeeding and being an aspiring rapper, but this is one of those times where I'm going to hold my tongue.

Andrew Gesslein, in comparison, no prior record; raised a family, not just fathered a child; maintained employment; paid his bills; drives a 1994 Ford Escort; barely holding onto him and his family. Described by his friend Charles Beasley this way — I have to say, Mr. Connell, I can't understand why you didn't call this witness as a character witness.

MR. CONNELL: Judge, we did. He couldn't be here.

THE COURT: Charles Beasley, who's an administrator at Kennan House, is known to the defendant as "Uncle Chuck." They've been close friends for the past 37 years. Mr. Beasley, acting as a character reference, recently told this officer, meaning the presentence investigator, "Culturally, we come from the same part of the country. My wife and I grew up there in New Jersey. He's particularly devoted to my wife. She's Old-World. A lot of us are totally shocked that this happened. This guy is extremely kind."

Mr. Beasley affirmed that the defendant had been injured

severely in a car accident, was collecting benefits, but was allowed to work part-time for the security agency. It was his opinion that when he started that gun draw, he couldn't stop. "I would say he's still in shock. He's a very gentle guy." That's who we're dealing with, both victim and defendant here.[87]

In *Commonwealth v. Flor*, 998 A.2d 606, 641-642 (Pa. 2010), it was alleged that the trial judge erred by not recusing himself from deciding post-sentence motions in light of perceived "biased" comments before and after sentencing.[88] The Supreme Court in holding otherwise recited the well-established standards applicable to recusal motions:

> It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially. As a general rule, a motion for recusal is initially directed to and decided by the jurist whose impartiality is being challenged. In considering a recusal request, the jurist must first make a conscientious determination of his or her ability to assess the case in an impartial manner, free of personal bias or interest in the outcome. The jurist must then consider whether his or her continued involvement in the case creates an appearance of impropriety and/ or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision

---

87. N.T.S. pp. 43-46.

88. Some of the trial judge's comments included the recital of a Biblical prophecy and the statement: "And I am sure that, perhaps hundreds of thousands of people, when they read or hear this sentence, will use your words and say, '*that punk got what he deserved*.'" *Id.* at 641 (emphasis in original).

that only the jurist can make. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overruled on appeal but for an abuse of discretion. In reviewing a denial of a disqualification motion, we recognize that our judges are honorable, fair and competent.

*Id.* quoting *Commonwealth v. Abu-Jamal,* 720 A.2d 79, 89 (Pa. 1998). *See also Commonwealth v. Whitmore,* 912 A.2d 827, 834 (Pa. 2006) ("This court presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice").

Once again, the Commonwealth is unable to point to any judicial ruling in this case that even raises the appearance of partiality. Likewise, nothing at the recusal hearing suggests that the sentence imposed was in error. To the contrary, it was a mandatory sentence, which was within the standard range of the guidelines. The first assistant district attorney, who has affixed his signature to the within motion, requested a standard range sentence.

Even so, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion...[They] can only in the rarest circumstances evidence the degree of favoritism or antagonism required... when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal." *Liteky v. United States,* 510 U.S. 540, 555 (1994). *See also United States v. Wecht,* 484 F.3d 194, 218 (3d Cir. 2007); *Abu-Jamal,* 720 A.2d at 90 (Adverse rulings alone do not establish the requisite bias warranting recusal, especially where the

rulings are legally proper).

The motion for recusal denigrates the comments made by this court at sentencing. However, it ignores the precedent from the United States Supreme Court and other courts supporting this court's right to provide its perspective of the trial. *See Liteky* 510 U.S. at 555; *United States v. Burnett*, 2013 WL 2333796 (E.D.Pa. May 22, 2013). Those cases reveal:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings...do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. *Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge*...[unless] they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

*Liteky*, 510 U.S. at 555 (emphasis added); *Burnett*, at *3.

In other words, "[i]mpartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." *Liteky*, 510 U.S. at 551 quoting *In re J.P. Linahan, Inc.*, 138 F.2d 650, 654 (2d Cir. 1943). "[T]he third circuit has repeatedly recognized, a judge's comments made during a judicial proceeding rarely warrant recusal." *Burnett*, at *3. *See also State v. Rizzo*, 31 A.3d 1094, 1131 (Conn. 2011) ("[T]here is nothing impermissible about an

opinion formed by a judge *after* a trial has concluded, on the basis of the evidence and arguments that have been presented and the judge's evaluation of them. Rather, 'a trial judge will normally and properly form opinions on the law, the evidence and the witnesses, from the presentation of the case. These opinions and expressions thereof may be critical or disparaging to one party's position, but they are reached after a hearing in the performance of the judicial duty to decide the case, and do not constitute a ground for disqualification'") (emphasis in original).

The Commonwealth apparently believes that they are immune from criticism or that distinguishing Andrew Gesslein from Michael Randolph is somehow improper. On the other hand, if this court demonized Andrew Gesslein, the Commonwealth would not be objecting.

A judge is not required to sit as a potted plant. For example, a judge is not restrained from telling a jury that it agrees with the verdict. It is also not improper to address a defendant after sentencing for the purpose of reiterating that the punishment was well-deserved. *Flor*, 998 A.2d at 642. *See also Commonwealth v. Travaglia*, 661 A.2d 352, 370 (Pa. 1995) (Judge's statements to media made after the appellant's trial and the conclusion of his first collateral attack that "[i]f anyone deserves to die, these two individuals...do for killing four people for fun," did not require recusal).[89] Furthermore, even if any of this court's statements at the sentencing hearing could be considered "ill advised," this does not mean that recusal is required. *Whitmore*, 912 A.2d at 833.

---

[89]. *See also Commonwealth v. Busanet*, 54 A.3d 35, 70-71 (Pa. 2012); *Commonwealth v. Druce*, 848 A.2d 104 (Pa. 2004).

Judgments may have been "formed" by this court to explain its assessment of the proceedings, and its reasons for not imposing a potentially harsher sentence. However, a mandatory sentence was imposed, the sentence was within the standard range of the guidelines, and the general principles regarding sentencing were followed. 42 Pa.C.S. § 9721(b).[90]

None of the cases cited by the Commonwealth in its motion supported recusal in this case. For example, *Commonwealth v. Darush*, 459 A.2d 727 (Pa. 1983) involved comments made by the judge when he was the district attorney about the appellant; *Commonwealth v. Benchoff*, 700 A.2d 1289 (Pa. Super. 1997) involved allegations that the judge allowed people to wear "stop the violence" pins and was influenced by his judicial retention election. In *Commonwealth v. Druce*, 796 A.2d 321 (Pa. Super. 2002) *appeal granted in part* 809 A.2d 243 (Pa. October 21, 2002); *judgment aff'd* 848 A.2d 104 (Pa. 2004), the trial judge, prior to sentencing, was interviewed by the associated press. Interpreting the code of judicial conduct, it was pointed out that the code's "provisions merely set a norm of conduct for all our judges and do not impose substantive legal duties on them." *Id.* at 109. While the judge's comments were violative of Canon 3A(6), they did not constitute a "blatant disregard for its purpose. The substance of the comments did not evince bias or prejudice, for or against appellant." *Id.* at 111. In other words, recusal was *not* warranted. In *In the Interest of McFall*, 617 A.2d 707 (Pa. 1992), the judge continued

---

90. *See Commonwealth v. Bonds*, 890 A.2d 414, 418 (Pa. Super. 2005); *Commonwealth v. Urrutia*, 653 A.2d 706, 710-711 (Pa. Super. 1995); *Commonwealth v. Gee*, 575 A.2d 628, 630 (Pa. Super. 1990).

to hear criminal cases while she was under investigation, and an "agent" for the FBI. Additionally, a quid pro quo bargain existed where the judge's cooperation would be made known to the same authorities who appeared before her to prosecute cases against the appellee's. Finally, in *Commonwealth v. Rhodes*, 990 A.2d 732 (Pa. Super. 2009), the judge, in imposing sentence, relied upon ex parte police reports he requested from the district attorney. The undisclosed use of those documents was a "source of substantial prejudice."

The trial of Andrew Gesslein was conducted in an unbiased manner. The Commonwealth is unable to point out any partial rulings or conduct which might have improperly affected the jury. The sentencing was consistent with the court's responsibilities. Following the required self-analysis, this court believed in its ability to be impartial. Furthermore, although critical comments may not be well-received, they neither create an appearance of impropriety and/or tend to undermine confidence in the judiciary.

For all the foregoing reasons, the award of a new trial, and the denial of the recusal motion should be affirmed.

Other Claims

The appellee did not file a cross-appeal from any other issue raised in its post-sentence motions. It was not required to do so. *See Basile v. H & R Block, Inc.*, 973 A.2d 417, 421 (Pa. 2009) ("[A] party adversely affected by earlier rulings in a case is *not required* to file a protective cross-appeal if that same party ultimately wins a judgment in its favor; the winner is not an "aggrieved party") (emphasis in original). *See* Pa.R.A.P. 501 and 511. In that regard, the

prevailing party has no standing to appeal. *Basile* at 421 n. 4; *UPS. Inc. v. Pennsylvania Public Utility Com'n*, 830 A.2d 941, 948 (Pa. 2003). However, although the appellee cannot appeal, other arguments can be considered as additional reasons why the trial court's order should be sustained. *In re Condemnation by City of Coatesville*, 898 A.2d 1186, 1187 n.3 (Pa.Cmwlth. 2006). *See also* 20 PAPRAC § 501:3, *Lack of aggrievement — Dismissal of appeal*, n. 15-17.

Therefore, this court will address the remaining issue raised in the post-sentence motions and discussed in the resolution of the post-sentence motions. The appellee contends that the Commonwealth failed to disclose Michael Randolph's juvenile adjudication for robbery. Defense counsel asserted that he only learned of the adjudication when he received the presentence report. The first assistant district attorney indicated that it was his "custom and practice to turn over everything in [his] file."[91] He conceded that he was in possession of the juvenile record, and maintained that it was disclosed.[92]

Defense counsel did submit a request for informal discovery and inspection, which included a request for "[t]he Criminal Record of Michael Randolph." Likewise, a motion to compel discovery..." was filed on September 18, 2012, which incorporated the discovery requests. A hearing was held on October 18, 2012, where it was represented that discovery was exchanged. As a result, the motion was withdrawn.

---

91. Notes of Testimony, Post-Sentence Motions Hearing (hereinafter N.T.P.S.), p. 82.
92. *Id.*

The defense presented in this case was self-defense. The relevance and admissibility of the juvenile adjudication is governed by Pa.R.E. 404(a)(2)(B). In *Commonwealth v. Amos*, 284 A.2d 748, 751-752 (Pa. 1971), it was held that a defendant asserting self-defense may use the victim's conviction, regardless of whether he had knowledge of it, to prove the violent propensities of the victim, and to establish that the victim was the aggressor. The limitation on the admissibility of such evidence is that the crimes should be "of the same nature, not too distant in time." *Id. See also Commonwealth v. Beck*, 402 A.2d 1371 (Pa. 1979) (three (3) year old assault conviction probative and admissible); *Commonwealth v. Quarles*, 456 A.2d 188 (Pa. Super. 1983) (twenty-two (22) year old conviction inadmissible). In *Commonwealth v. Mouzon*, 53 A.3d 738 (Pa. 2012), the decision to exclude evidence of the victim's nine (9) year-old robbery conviction was deemed a proper exercise of discretion. However, the issue of remoteness was not reached. *Id.* at 753 n.11.

This court was unable to exercise its discretion because the robbery adjudication was never presented for evaluation. *Commonwealth v. Bullock*, 948 A.2d 818 (Pa. Super. 2008) (Admission of evidence is within the sound discretion of the trial court). Robbery is an offense that involves aggression, and so the nature of the adjudication would permit its admissibility.

The remoteness of the adjudication is problematic, especially in light of Michael Randolph's commitment to a juvenile facility after his adjudication, which occurred on November 7, 2002. By analogy, if impeachment under Pa.R.E. 609(b) was at issue, and the release date from placement was after April 1, 2003, the adjudication would

have been *per se* admissible. *Commonwealth v. Randall*, 528 A.2d 1326, 1329 (Pa. 1987). *See also* 42 Pa.C.S. §6354(b). None of that information was presented for this court's review.

The exclusion of the adjudication, if it was admissible, would not be harmless error. *Commonwealth v. Young*, 638 A.3d 244, 246 (Pa. Super. 1994) (Summary conviction for retail theft was admissible to impeach witness and its exclusion was not harmless error). In order to be harmless the court must be convinced beyond a reasonable doubt that:

> (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other, untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id. See also Commonwealth v. Garcia*, 712 A.2d 746, 748-749 (Pa. 1998).

The only reasonable argument that could be constructed for harmless error in this case would be that the error did not prejudice the appellee. Evidence of guilt was certainly underwhelming, and the effect of a ten (10) year or so adjudication for robbery may or may not have tipped the scales in favor of Andrew Gesslein. *See Young*, 638 A.3d at 246.

A more troubling discussion that would need to be

tackled if this court concluded that the adjudication was not disclosed is a potential *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963). "[T]he United States Supreme Court in *Brady* held that due process is violated when the prosecution withholds evidence favorable to a defendant. Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule. To establish a violation of *Brady*, a defendant is required to demonstrate: (1) evidence was suppressed by the Commonwealth, either willfully or inadvertently; (2) the evidence was favorable to the defendant; and (3) the evidence was material, in that its omission resulted in prejudice to the defendant." *Commonwealth v. Dennis*, 17 A.3d 297, 308 (Pa. 2011) (internal citations omitted). "Evidence is material under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." *Commonwealth v. Chamberlin*, 30 A.3d 381, 409 (pa. 2011) citing *Kyles v. Whitley*, 514 U.S. 419(1995). A witness' criminal record has been considered a necessary and valuable tool for the defense and falls within the ambit of *Brady*. *See Commonwealth v. Copeland*, 723 A.2d 1049 (Pa. Super. 1998); *see also Commonwealth v. Wallace*, 455 A.2d 1187, 1191-1192 (Pa. 1983). The Commonwealth posits that the adjudication was inadmissible and thus could not be a *Brady* violation. This contention, as the Commonwealth recognizes, conflicts with *Commonwealth v. Willis*, 46 A.3d 648, 670 (Pa. 2012) (Admissibility at trial is not a prerequisite to a determination of materiality under *Brady*).

The burden, however, rests with the appellee to "prove, by reference to the record that evidence was withheld or

suppressed by the prosecution." *Chamberlin*, 30 A.3d at 409 quoting *Commonwealth v. Paddy*, 15 A.3d 431, 451 (Pa. 2011); *See also Commonwealth v. Burkett*, 5 A.3d 1260, 1268 (Pa. Super. 2010); *Commonwealth v. Nero*, 58 A.3d 802, 809-810 (Pa. Super. 2012). In *Commonwealth v. Sanchez*, 907 A.2d 477, 490-493 (Pa. 2006), discovery was allegedly exchanged in a lavatory in the Lehigh County Courthouse. While finding the method of discovery "less than exemplary," it was held that the trial court's credibility judgment would not be disturbed. Justice Newman, in her concurring opinion, referred to the Commonwealth's compliance with the mandatory discovery rule as "serendipitous at best."

Here, this court cannot conclude that the appellee met his burden of proof. To do so, this court would be required to make a credibility assessment between counsel. Both counsel provided competing accounts regarding either the exchange or receipt of this significant information. If admissible, the adjudication of delinquency could have been weaved into the self-defense arguments. Therefore, defense counsel would be desirous of learning Michael Randolph's criminal history, and on the lookout for that information. On the other hand, discovery in a homicide case is often voluminous and items of discovery can be misplaced. In lieu of a credibility assessment, which this court is not prepared to do, this court stresses that no other corroborating information was presented. It is understandable that proving a negative is difficult, but it is the appellee's burden of proof, not the Commonwealth's.

## ORDER

And now, this 20th day of December, 2013, it

appearing that the Commonwealth (hereinafter appellant) has filed a notice of appeal in the above-captioned matter on November 15, 2013; it further appearing that the appellant has filed a "Concise statement of matters complained of on appeal" pursuant to Pennsylvania Rule of Appellate Procedure 1925(b); it further appearing that our accompanying opinion satisfies the requirements of Pennsylvania Rule of Appellate Procedure 1925(a);

It is hereby ordered that the clerk of judicial records, criminal division, shall transmit the record in the above-captioned matter to the Superior Court forthwith;

It is further ordered that the clerk of judicial records shall include with the transmittal of the record the following documents:

1. A copy of the appellee's pre-sentence investigation report submitted for review by the Superior Court, and that said report shall be sealed to preserve its confidentiality pursuant to Pa.R.Crim.P. 703.

2. Notes of testimony from the trial beginning April 1, 2013 through April 4, 2013, volumes I-IV.

3. Notes of testimony from the sentencing held on June 11, 2013.

4. Notes of testimony from the motion for recusal and post-sentence motions hearing held on September 3, 2013.

5. Notes of testimony from the bail hearing held June 28, 2012, pre-trial hearing held August 17, 2012, Pre-trial hearing held October 8, 2012, and the pre-trial conference held October 23, 2012.