**COMMONWEALTH of Pennsylvania,**
**Appellee,**

**v.**

**Jimmie JOHNSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 18, 2002.
Filed Feb. 20, 2003.

John Packel, Public Defender, Philadelphia, for appellant.

Catherine L. Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: JOHNSON, TAMILIA and POPOVICH, JJ.

POPOVICH, J.:

¶ 1 Appellant Jimmie Johnson appeals from the judgment of sentence entered November 19, 2001, in the Court of Common Pleas, Philadelphia County, following his conviction for criminal trespass and receiving stolen property (RSP). Upon

review, we reverse the judgment of sentence.

¶ 2 On the afternoon of June 12, 2000, Appellant was seen leaving a house located at 420 Ritner Street in Philadelphia. Although Appellant told police officers that he had purchased the house, Richard Braude was the true owner of the house and never sold the house nor gave anybody permission to sell the house. Appellant was arrested. After a bench trial, Appellant was found guilty of criminal trespass and RSP which were both graded as felonies of the third degree.

¶ 3 On November 19, 2000, Appellant was sentenced to 15 to 30 months imprisonment for the criminal trespass conviction. No further penalty was imposed for the RSP conviction. Appellant filed a timely notice of appeal. The trial court ordered Appellant to file a Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b), and Appellant complied. Thereafter, the trial court authored an opinion pursuant to Pa.R.A.P. 1925(a). Appellant raises the following issues on appeal:

(1) Was not the evidence insufficient as a matter of law to sustain appellant's conviction for Criminal Trespass, a felony of the third degree, where the Commonwealth failed to prove beyond a reasonable doubt that appellant was not licensed or privileged to be [sic] enter the home, an essential element of the crime, as the appellant explained to police that he had bought the property, that he had a bill of sale for the property, a deed, and copies of checks used to purchase the property, and believed that he was the true owner?

(2) Was not the evidence insufficient as a matter of law to sustain appellant's conviction for receipt of stolen property where the Commonwealth failed

to prove beyond a reasonable doubt that appellant intentionally received, retained or disposed of movable property of another knowing that it had been stolen, or believing it had probably been stolen?

Appellant's brief, at 3.

¶ 4 Both of Appellant's issues concern whether the evidence was sufficient to uphold the convictions. Regarding sufficiency of the evidence claims, this Court has held previously:

> In evaluating a challenge to the sufficiency of the evidence, we must determine whether viewing the evidence in the light most favorable to the verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. *Commonwealth v. Heistand,* 454 Pa.Super. 482, 685 A.2d 1026, 1028 (1996). The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. However, any questions or doubts are to be resolved by the factfinder, unless the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the circumstances. *Commonwealth v. Morales,* 447 Pa.Super. 491, 669 A.2d 1003, 1005 (1996). The trier of fact is free to believe all, part or none of the evidence. *Commonwealth v. Price,* 416 Pa.Super. 23, 610 A.2d 488, 489 (1992). "The standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Swerdlow,* 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994).

*Commonwealth v. Thompson,* 779 A.2d 1195, 1197 (Pa.Super.2001), *appeal denied,* 567 Pa. 760, 790 A.2d 1016 (2001).

¶ 5 In *Commonwealth v. Yetsick,* 402 Pa.Super. 615, 587 A.2d 788, 790 (1991), we recognized:

> [T]he trier of fact is free to believe all, part, or none of the evidence presented, [*Commonwealth v.* ]*Griscavage, supra,* 512 Pa. [540] at 546, 517 A.2d [1256] at 1259 [(1986 )], and that "the Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Commonwealth v. Harper, supra,* 485 Pa. [572] at 576, 403 A.2d [536] at 538 [(1979)].

■ The trial court opinion contained the following brief factual history:

> The facts underlying the instant appeal concern a [break-in] of a property located at 420 Ritner [S]treet, which occurred on June 12, 2000. The complainant[, Richard Braude,] had recently bought the house and was renovating it. The defendant had entered without permission and was claiming to own the property and attempted to sell it to a third party on the day in question.

*See* Trial Court Opinion, 6/11/02, at 1.

¶ 6 We rely upon the trial testimony to elaborate upon the factual history of this unusual case. The Commonwealth's first witness was Mr. Braude. He owned the house at issue. On June 12, 2000, the house was under renovation. Although he was not sleeping at the house, Mr. Braude used the house's dining room as an office. *See* N.T. Hearing, 10/9/01, at 12. Mr. Braude was a probation officer and rented properties. He used the house address as his work address. *Id.* at 17. Before June 12th, Mr. Braude was last in the house on June 9th. *Id.* at 11. When Mr. Braude went to the house on June 12th, he saw that a front window screen had been taken out and was mangled and laid on the porch. Mr. Braude did not have his keys to the house and peered inside the window and saw things in the house to be out of place. *Id.* at 13. He left the house to retrieve his keys. While retrieving his keys, Mr. Braude received a telephone call from a neighbor telling him that police officers were at the house. Mr. Braude returned to the house and saw Appellant and another man talking to police officers. *Id.* at 14. Appellant told Mr. Braude that he had bought the house from a Richard Braude and that he had the keys for the house. *Id.* at 15.[1] Appellant's key fit a door to the house. Mr. Braude testified that there were marks on one of the door locks and the door wood surrounding the lock and that he had not seen the marks previously. *Id.* at 16.

¶ 7 When Mr. Braude entered the house, he noticed that certain things were moved. *Id.* at 16–17. First, Mr. Braude testified that he noticed that an envelope that he believed contained a check in the amount of $1,100.00 was missing and that he had last seen the envelope on June 9th. *Id.* at 17, 19. On cross-examination, Mr. Braude admitted that he did not open the envelope. *Id.* at 24. A trace put on the check established that the check was cashed and his name was forged. *Id.* at 25. However, the check was cashed on June 7th, two days prior to when Mr. Braude said he had last seen the check on June 9th. *Id.* at 26. Mr. Braude was reimbursed the money for the check. *Id.* at 27.

¶ 8 Next, Mr. Braude noticed that drinking glasses were moved. *Id.* at 17. He found some of the drinking glasses on the

---

1. Mr. Braude testified that his name is spelled oddly and that it did not make sense to him when Appellant pronounced his name correctly. *Id.* at 15.

floor inside the house and two of the glasses outside. His mail was stuffed under a pillow in the living room. *Id.* at 18. Mr. Braude found pliers and screwdrivers that did not belong to him outside the house. *Id.* at 19–20.[2]

¶ 9 Mr. Braude listed the damage to his property as the damage to the window screen, a lock, the wood around the lock and the drinking glasses that were scratched and cracked. *Id.* at 28.

¶ 10 After June 12th, Mr. Braude went to the police station and identified the original deed transferring the property from his parents to himself. *Id.* at 22–23. He did not believe that the deed was in the house. *Id.* at 23.

¶ 11 Mr. Braude did not give Appellant permission to go into the house. *Id.* at 14–15. He did not sell his property to anybody or sign a deed transferring the house. *Id.* at 20. Mr. Braude had heard of other property owners reporting that people purchased their property without their knowledge. The trial court took judicial notice that there were stories in the newspaper "recently" about such things going on. *Id.* at 29.

¶ 12 Mr. Braude testified that Appellant said that he was attempting to sell the house to the other man present at the house on June 12th. *Id.* at 29.

¶ 13 The Commonwealth called Officer Steven Jefferson to testify also. Officer Jefferson testified that he was called to the house at issue on the afternoon of June 12, 2000, to investigate an alleged burglary in progress. *Id.* at 30–31. Officer Jefferson saw Appellant leaving the house by way of the front door and locking it. *Id.* at 31, 40. Appellant was carrying screwdrivers, pli-

ers, a set of keys and a deed to the house. Appellant told Officer Jefferson that he owned the house. *Id.* at 32. Shortly thereafter, Mr. Braude arrived at the property, and he told Officer Jefferson that he owned the house. Officer Jefferson did not know who was the actual owner of the house. Appellant told the police that he had paperwork confirming that he was the true owner of the house. *Id.* at 33. Appellant was taken to his house in the 400 block of Mifflin where he showed the officers checks and a copy of the deed he had already showed to them. *Id.* at 34–35.

¶ 14 Officer Jefferson admitted that the officers did not know what was going on. They took Appellant to South Detectives and told the detectives what had happened. Appellant was then arrested. *Id.* at 39.

¶ 15 Officer Jefferson did not see any personal items on the porch or steps and did not see Appellant carrying anything out of the house. *Id.* at 40. The officers searched Appellant and found nothing on him that did not belong to him. *Id.* at 41.

¶ 16 The defense presented the testimony of Wilbur Lockett. Appellant and Mr. Lockett were in a bar talking about blight and housing problems in Philadelphia on an unspecified weekend evening. *Id.* at 45, 52–53.[3] A man by the name of Dahoo Bey approached Appellant, and they began to talk. *Id.* at 45–46. Mr. Lockett heard only part of their conversation. Mr. Lockett heard Appellant say something to the effect that he was going to buy a house. *Id.* at 47, 54. Mr. Lockett went with Appellant and Mr. Bey in Mr. Bey's car to look at Mr. Braude's house. *Id.* at 47.

---

**2.** Appellant had pliers and screwdrivers when he was leaving the house, and the police officers told him to drop the items on the porch, where the item remained. *Id.* at 38.

**3.** Mr. Lockett was not with Appellant the day Appellant was arrested. *Id.* at 47.

Mr. Bey did not have the keys for the house.

¶ 17 Mr. Lockett saw Appellant give Mr. Bey money for the house and Mr. Bey give Appellant a deed. *Id.* at 49. Mr. Lockett learned later that Appellant paid $2,000.00 cash that night for the house. *Id.* at 55–56. Mr. Lockett heard that Mr. Bey "was the man that goes around town selling people houses." *Id.* at 56.

¶ 18 A document identified as a bill of sale was presented into evidence by Appellant that identified the purchase price as $2,000.00.[4]

¶ 19 As the trial court was unsatisfied with the case presented by the Commonwealth, the trial court called Detective Vincent Guarna as a witness. *Id.* at 60. Detective Guarna testified that Mr. Braude owned the house and that Appellant had no right to be in the house. He admitted that Appellant had a deed to the house. *Id.* at 61. Detective Guarna admitted that after interviewing Mr. Braude and taking Appellant's statement, Detective Guarna testified, "I realized the [Appellant] had been either the victim of a scam or whatever. But, regardless, [Appellant] had no reason to be in the house, after speaking to [Mr. Baude] and interviewing him." *Id.* at 61–62. Detective Guarna testified that Appellant had been arrested already when he was brought in to the police station and that Detective Guarna just took a statement from him. *Id.* at 62.

¶ 20 Before finding Appellant guilty of criminal trespass and RSP, the trial court stated:

These are the kind of cases that upset me a little bit. The reason why, it ap-

pears there should have been much, much, much more investigation done in conjunction with this case.

Especially [when] we're aware of the fact this is sort of a racket going on around the City.

However, I tend to believe that that individual is not quite as naïve as he makes out to be. While I already ruled that he's not guilty of burglary, I think this fellow is somewhat similar to a man presented with a car which he knows damn right well the value is way in excess of what he's going to pay for the car. And what does he do, closes his eyes and says this is a good deal. I'm not going to look into this any further.

That is how I liken this deal to. You are not going to tell me differently.

*Id.* at 68.

¶ 21 After finding Appellant guilty, the trial court stated:

No doubt in my mind, your friend[,Mr. Lockett,] was not a part of this deal. No doubt in my mind that at some point, your friend said, hey, you know, watch yourself. No doubt in my mind you said I know what I'm doing, forget about telling me what I'm doing.

[. . .] You know as well as I do that a person just does not give you a deed. You go to a notary.

*Id.* at 71.

¶ 22 The trial court then questioned Appellant whether he made settlement on his house, presumably the house Appellant was living in when he took the officers to it to show them the paperwork. Appellant answered that he had made settlement and

---

4. Appellant argues on appeal that there is no proof that Appellant paid $2,000.00 total for the house, or whether the $2,000.00 was merely a down payment on the house. We note that Appellant presented the bill of sale into evidence and did not object when the trial court stated immediately thereafter that the purchase price was $2,000.00. *See* N.T. Trial, 10/9/01, at 50. Moreover, Mr. Lockett, Appellant's witness, testified that Appellant paid $2,000.00 for the house. *Id.* at 55.

then denied that he had been to a title company or a notary. Appellant answered that he entered into a lease purchase agreement for the house and that he had "paid so much money." *Id.* at 72. His attorney stated that settlement had not occurred. *Id.* at 72.

¶ 23 Based upon all of the above, we now determine whether there was sufficient evidence to convict Appellant of criminal trespass and receiving stolen property.

¶ 24 Regarding the criminal trespass conviction, the statute provides, in relevant part:

**Criminal trespass**

**(a) Buildings and occupied structures.—**

(1) A person commits an offense if, knowing that he is not licensed or privileged to do so, he:

(i) enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure or separately secured or occupied portion thereof[.]

* * *

(2) An offense under paragraph (1)(i) is a felony of the third degree[.]

* * *

**(c) Defenses.**—It is a defense to prosecution under this section that:

* * *

(3) the actor reasonably believed that the owner of the premises, or other person empowered to license access thereto, would have licensed him to enter or remain.

18 Pa.C.S.A. § 3503.

¶ 25 Appellant argues that he was the victim of a scam and that he believed that he was lawfully in Mr. Braude's house. Appellant argues that the Commonwealth failed to prove that he knew or should have known that he was not licensed to be in the house. Appellant argues that the scienter element should not have been disregarded because the trial court thought that Appellant should have been a more savvy home buyer.[5] In effect, Appellant has invoked the "reasonable belief" defense contained in Section 3503(c)(3) to justify his presence in the house. That is, Appellant argues that he reasonably believed that he was entitled to be in the house. Therefore, we must determine whether the trial court erred in finding Appellant's belief to be unreasonable.

¶ 26 The trial court held that Appellant's belief was unreasonable because he knew as well as the trial court that "a person just does not give you a deed. You go to a notary." N.T. Trial, 10/9/01, at 71. However, nothing exists in the record to support this finding. Moreover, after the trial court found Appellant guilty of criminal trespass, the trial court attempted to demonstrate that Appellant knew how real estate was bought and sold when he asked Appellant if he had made settlement on the house he lived in. *Id.* at 71. It is clear from Appellant's responses that despite the fact that Appellant thought he had participated in a settlement on the house he lived in, he had not because he does not own the house. Rather, he was engaged in a lease-to-own arrangement. *Id.* at 71–72. The exchange exemplified the weakness of the trial court's finding that Appellant was knowledgeable about real estate matters.

¶ 27 Also, the trial court likened Appellant to a person who pays less for a car

---

**5.** It is clear that criminal trespass has a scienter requirement. *See Commonwealth v. Car-* *ter,* 482 Pa. 274, 393 A.2d 660 (1978).

than the person knows the car is worth, without choosing to look into the matter any further. *See* N.T. Trial, 10/9/01, at 68–69. By analogy, the trial court has alleged that Appellant should have known that the house was worth more than $2,000.00 and looked into the sale before he gave away his money. This finding is not supported by the record. As noted by defense counsel, no evidence was presented about the condition of the house other than Mr. Braude's testimony that he was renovating the house and Mr. Lockett's testimony that the house was a "porch house" and that it looked nice from the outside. *Id.* at 55. No evidence was presented about the neighborhood where the house was located. The value of the house was not presented, and, therefore, it will not be presumed. Therefore, there is no support for the trial court's finding that Appellant should have known that the house was worth more than $2,000.00.

¶ 28 The trial court expressed its frustration that the police officers and detectives failed to perform further investigation into this matter. Despite this realization and the conflicting evidence presented, the trial court found Appellant to be guilty of the crimes charged. In doing so, we find that the trial court ignored some of the basic principles fact finders are bound to follow.

¶ 29 In *Commonwealth v. Davis*, 312 Pa.Super. 85, 458 A.2d 248, 250 (1983), we reiterated:

> The facts and circumstances must be considered together with all reasonable inferences arising from them. *Commonwealth v. Carter, supra*[ 272 Pa. Super. 411, 416 A.2d 523 (1979)]; *Commonwealth v. Anderson*, 265 Pa. Superior Ct. 494, 402 A.2d 546 (1979). However, "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, the jury may not be permitted to guess which inference it will adopt." *Commonwealth v. Hubbard*, 472 Pa. 259, 270, 372 A.2d 687, 692 (1977). *See Commonwealth v. Woong Knee New*, 354 Pa. 188, 47 A.2d 450 (1946). "When a party on whom the burden of proof rests in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither." *Commonwealth v. Anderson, supra* 265 Pa.Super. at 500, 402 A.2d at 548.

Mere suspicion and conjecture do not suffice to sustain a conviction.

*See Commonwealth v. Kennedy*, 499 Pa. 389, 394, 453 A.2d 927, 929 (1982).

¶ 30 We find that two opposing and mutually inconsistent inferences could be drawn from the facts presented herein. The first is that Appellant knowingly paid $2,000.00 to Mr. Bey for a house that he knew did not belong to Mr. Bey in a transaction that he knew was not legally binding. The second is that Appellant was the victim of a scam. Neither Officer Jefferson nor Detective Guarna knew which inference was true. Based upon the facts presented, the trial court erred in finding the first inference to be true over the second. Moreover, the fact that the trial court knew that similar scams were occurring throughout the city supports this finding.

¶ 31 Lastly, we find the fact that Appellant may have been in the process of soliciting buyers for the house after his "purchase" of the house is of no consequence. If Appellant reasonably believed that he owned the house, he was free to do whatever he wanted to do with it.

¶ 32 For all of these reasons, we find that the trial court erred in finding Appellant guilty of criminal trespass. There-

fore, we reverse Appellant's judgment of sentence for the criminal trespass conviction.

¶ 33 Regarding the RSP conviction, the statute provides, in relevant part:

**Receiving stolen property**

**(a) Offense defined.**—A person is guilty of theft if he intentionally receives, retains or disposes of *personal property* of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.

**(b) Definition.**—As used in this section the word "receiving" means acquiring possession, control or title, or lending on the security of the property.

18 Pa.C.S.A. § 3925 (emphasis added).

¶ 34 Title 18 Pa.C.S.A. § 3902 provides that RSP is graded as a felony of the third degree "if the amount involved exceeds $2,000, or if the property stolen is a firearm, automobile, airplane, motorcycle, motorboat or other motor-propelled vehicle, or in the case of theft by receiving stolen property, if the receiver is in the business of buying or selling stolen property."

¶ 35 The trial court made reference to its understanding that the RSP charge concerned the theft of the house. *See* N.T. Trial, 10/9/01, at 65. Pursuant to the statute, RSP only pertains to the theft of personal property, not real property. *See* 18 Pa.C.S.A. § 3925(a). Pursuant to documentation in the record, Appellant was charged with RSP relative to the drinking glasses and the check, not the house. Therefore, the trial court erred in finding that the house was the subject of the RSP charge.

¶ 36 Regarding the drinking glasses, there was no evidence presented that any of the glasses were missing once the glasses were located in various locations inside and outside the house. The glasses were not found in Appellant's possession. Further, there was no evidence that Appellant was the person who moved the drinking glasses from their original location. Moreover, the original location of the glasses was never disclosed. Although Mr. Braude testified that the glasses were scratched and cracked, this does not warrant a RSP conviction related to the glasses.

[9] ¶ 37 Regarding the check, evidence was presented that the check was cashed on June 7, 2000, two days before Mr. Braude allegedly had last seen the envelope containing the check on June 9, 2000. Clearly, Mr. Braude did not see an envelope containing the check on June 9, 2000. Additionally, evidence was presented that Mr. Braude's signature was forged on the check. No testimony or evidence was presented that Appellant possessed the check or that Appellant forged Mr. Braude's signature.

¶ 38 Appellant allegedly bought the house from a third person. Therefore, it is reasonable to believe that Appellant was not the only person in the house other than Mr. Braude who would have had access to the check or the drinking glasses. Without some other evidence linking Appellant to the check, the RSP conviction concerning the check cannot stand. Therefore, we reverse Appellant's judgment of sentence for the RSP conviction.

¶ 39 Judgment of sentence reversed. Appellant discharged. Jurisdiction relinquished.