J-A20039-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| ANDREW GESSLEIN, | : | |
| | : | |
| Appellee | : | No. 3222 EDA 2013 |

Appeal from the Order entered on November 8, 2013
in the Court of Common Pleas of Lehigh County,
Criminal Division, No. CP-39-CR-0003003-2012

BEFORE:  FORD ELLIOTT, P.J.E., MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:                **FILED DECEMBER 08, 2014**

The Commonwealth of Pennsylvania appeals from the trial court's denial of its Motion to recuse the Honorable Robert L. Steinberg ("Judge Steinberg"), and Judge Steinberg's Order denying in part and granting in part the post-sentence Motions filed by Andrew Gesslein ("Gesslein"), which resulted in a new trial for Gesslein.  We affirm the denial of the Motion to recuse Judge Steinberg, reverse the Order granting a new trial, vacate Gesslien's judgment of sentence and remand for resentencing.

On April 29, 2012, at approximately 2:15 a.m., Michael Randolph ("Randolph") and a group of friends attempted to enter the North End Republican Club ("the Club"), located in Allentown, Pennsylvania.  Gesslein, an armed guard employed by a private security firm hired by the Club, denied Randolph entry.  After several arguments and unsuccessful attempts

to enter the Club, Randolph and his friends pushed past Gesslein. Immediately thereafter, Gesslein shot Randolph three times. Randolph died as a result of his injuries.

A jury found Gesslein guilty of voluntary manslaughter, 18 Pa.C.S.A. § 2503(b), implicitly rejecting Gesslein's claim of self-defense. The Commonwealth sought the imposition of the mandatory minimum sentence of five years in prison, pursuant to 42 Pa.C.S.A. § 9712. Applying section 9712(a), the trial court sentenced Gesslein to five to ten years in prison, after which Gesslein filed post-sentence Motions. While those Motions were pending, the Commonwealth filed a Motion to Recuse Judge Steinberg. After a hearing, Judge Steinberg denied the Commonwealth's Motion.

The trial court conducted a hearing on Gesslein's post-sentence Motions. On November 8, 2012, the court granted Gesslein's Motion for a New Trial, concluding as a matter of law that the verdict was against the weight of the evidence. Thereafter, the Commonwealth filed the instant timely appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal.

The Commonwealth now presents the following claims for our review:

[1.] Did the [trial] court abuse its discretion when it determined that the verdict was against the weight of the evidence where the court misapplied the standard of review by placing itself as the thirteenth juror and substituting its judgment for the jury's credibility findings and resolution of evidence?

[2.] Did the [trial] court abuse its discretion in denying the Commonwealth's [M]otion for recusal prior to considering

- 2 -

[Gesslein's] post-sentence [M]otions based on the court's bias both against the Commonwealth and victim and, at a minimum, the appearance of bias as manifested by the court's statements and extraordinary conduct from the verdict through post-sentence [M]otions?

Brief for the Commonwealth at 4 (issues renumbered).

First, the Commonwealth argues that the trial court abused its discretion by granting Gesslein a new trial. *Id.* at 43. Specifically, the Commonwealth challenges the trial court's conclusion that the verdict was against the weight of the evidence. *Id.* According to the Commonwealth,

the [trial] court improperly placed itself in the position of the thirteenth juror and substituted its credibility findings for the jury's. The court ignored large swathes of testimony and evidence, and engaged in conjecture to support its conclusions….

*Id.* Therefore, the Commonwealth argues, the trial court's Order must be reversed. *Id.* at 65.

Appellate review of a weight of the evidence determination by the trial court "is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted). "Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion." *Commonwealth v. Brown*, 648 A.2d 1177, 1190 (Pa. 1994) (citation omitted).

In its Opinion, the trial court set forth its reasons for concluding that the verdict is against the weight of the evidence:

No reasonable person could argue that [] Randolph was not aggressive in both manner and deed toward [] Gesslein. He forced his way into the Club after he directed threats at [] Gesslein because he was not permitted admission into the Club. **It is similarly evident that [] Gesslein's use of deadly force was dependent on whether [] Randolph had a firearm, and reached for it during their confrontation.** However, to paraphrase Justice Oliver Wendall Holmes, Jr., "Detached reflection cannot be demanded in the presence of an uplifted [gun]." *Brown v. United States*, 256 U.S. 335, 343 (1921); *Commonwealth v. Soto*, 657 A.2d 40, 41 (Pa. Super. 1995) (A court must be careful not to examine the reasonableness of a defendant's belief with 20/20 clarity of hindsight).

The focal point of the Commonwealth's evidence is that no firearm was recovered from the body of [] Randolph by the police. Sergeant Alicia Conjour ["Sergeant Conjour"] was one of the initial officers who responded to the Club after the shooting. She observed [] Randolph on the ground at the foot of the stairs to the door of the Club. A large crowd had gathered in the parking lot behind the Club, which she described as "generally hostile to the police." Police personnel were needed to "get the crowd back" so EMS could provide assistance to [] Randolph. Her entire shift responded[,] which included fourteen (14) other officers. She encountered no cooperative witnesses, and her inquiries were met with "expletives."

**Two equally reasonable and mutually inconsistent inferences can be drawn from these set of circumstances.** [] **Randolph either did not possess a firearm, or in the morass of hostility, the firearm was spirited away.** "When two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, a jury must not be permitted to guess which inference it will adopt, especially when one of the two guesses result in depriving a defendant of his life or his liberty. *Commonwealth v. Gruff*, 822 A.2d 773, 788 n.12 (Pa. Super. 2003); *Commonwealth v. Johnson*, 818 A.2d 514, 521 (Pa. Super. 2003) ("When a party on whom the burden of proof rests in either a criminal or a civil case, offers evidence consistent with opposing propositions, he proves neither.").

…

None of [] Randolph's "friends" who bolted inside the Club were presented as witnesses. Furthermore, the testimony of [Miguel] Gomes ["Gomes"] can only be characterized as a fabrication. The shell casings from [] Gesslein's firearm were found on the opposite side of the room from where [] Gomes placed [] Gesslein. Additionally, almost all of the Commonwealth's other witnesses depicted some type of confrontation between [] Gesslein and [] Randolph inside the Club, except [] Gomes. [] Gomes would only say, when asked on cross-examination, that outside the Club, [] Randolph was heard exclaiming, "[w]e should fuck him up."

[] Gesslein provided the most detailed testimony concerning the confrontation inside the Club, but corroborating testimony was also provided by [Anthony Eric] Jones ["Jones"] and [Robert] Smith, [Jr. ("Smith"),] although Smith's testimony regarding his location at the time of the shooting was contradicted by other witnesses. [Lakera] Kelley ["Kelley"], who knew [] Randolph, heard the threats outside the Club, and the gunshots in the Club. Her testimony neither supported nor refuted the Commonwealth's theory. [] Gomes is the only witness who denied that a physical altercation preceded the shooting. He is also the only witness who testified that after [] Randolph entered the Club, he raised his hands and said[,] "I told you I was going to get the 'f' in," and moments later from a distance of ten (10) feet away, [] Gesslein shot him.

Trial Court Opinion, 12/20/13, at 11-14 (emphasis added, citations omitted).

As set forth above, the trial court concluded that the Commonwealth had failed to disprove, beyond a reasonable doubt, Gesslein's claim of self-defense. In so holding, however, it appears that the trial court improperly undertook the function of the jury, assigning its own weight to the Commonwealth's evidence and its own credibility determinations as to the witnesses' testimony. Further, our review of the record discloses that the

trial court's reasons for granting a new trial are not supported by the evidence.

In its Opinion, the trial court rejected Gomes's eyewitness testimony because Gomes purportedly had failed to testify about any type of physical altercation between Randolph and Gesslein. *Id.* at 13. According to the trial court, "Gomes would only say, when asked on cross-examination, that outside the Club, [] Randolph was heard exclaiming, '[w]e should fuck him up.'" *Id.* Our review of the record, however, discloses that Gomes, in fact, testified about an altercation at the door of the Club:

Q. [The Commonwealth]: … And when you arrived[,] were there other people already in the parking lot?

A. [Gomes]: Yes.

Q.: Could you tell the ladies and gentlemen of the jury when you got there and you saw the people in the parking lot, did you immediately go in or what was the process that you went through to gain access to the Club?

A.: Well, when I went there[,] there was [*sic*] people all over the steps. And then the – the guy sitting there he was at the door and **it was a commotion. When I got there[,] there was already a commotion, like argument, you know, because they won't let somebody in. And it was going back and forth for a while.**

And then I crept to the side of the steps and I went to the door and I told them I was here with a party. It was a birthday party that I was invited to go there. And [Gesslein] said, well, that person is not a member here, so you can't get in. So I was, you know, like I had the same problem they did, you know.

**And they kept going on I would say for … ten or fifteen minutes arguing.**

- 6 -

> Somehow [Gesslein] closed the door and then another person came in and knocked. And when he opened [the door] I happened to peek in and I seen [*sic*] the owner sitting by the table, and he told [Gesslein] to let me in.
>
> And that's how the kid [Randolph] went in behind me.

N.T., 4/2/13, at 130-31 (emphasis added). Thus, the trial court's rejection of Gomes's testimony, based upon Gomes's failure to testify about an altercation at the Club's entrance, finds no support in the record.

The trial court also rejected Gomes's testimony because it was contradicted by incontrovertible physical facts. Trial Court Opinion, 12/20/13, at 14. According to the trial court, the shell casings from Gesslein's firearm "were found on the opposite side of the room from where Gomes placed [] Gesslein." *Id.* at 13. Applying the "incontrovertible physical facts rule," the trial court opined that, "[b]ased on the recovery of shell casings, the events as retold by [] Gomes were a work of fiction." *Id.* at 14.

The "incontrovertible physical facts rule" provides that "where the testimony of a witness is contradicted by incontrovertible physical facts, the testimony of such witness cannot be accepted …." *Commonwealth v. Newman*, 470 A.2d 976, 979 (Pa. Super. 1984). In *Newman*, however, this Court also recognized that "[t]he rule is inapplicable when the facts depend upon estimates of distances." *Id.*

The record reflects that Gomes testified as follows regarding the shooting:

As soon as you walk in[,] you gotta go to the left and there's a table there. And you gotta turn around and sign.

And as soon as I walked in and signed the … gentleman, the kid [Randolph], he walked in and he stood in front of the pool table. He took his hat off and put his hands up and said, "I told you I was going to get in."

You know, it happened so quick, because [Randolph] glanced to the right, he seen [Gesslein] like in form to shoot, and he tried to run out the door. That's when he shot.

N.T., 4/2/13, at 131. Gomes further testified that,

when [Randolph] burst in[,] the security guard took like I'd say about six to ten steps back. I mean he was like more towards the bathroom, you can't even see the bathroom there, but he was more towards the bathroom, closer to the bathroom.

…

… [Gesslein] drew the gun and he got into a shooting form. Like it wasn't like he was standing up, like his knees were bent and everything ….

…

[Randolph] glanced – well, he glanced at the security guard and he seen the gun and his friend probably, I believe his friend seen it before him, because his friend ran out the door first, you know. And as soon as he seen it he turned to the left to run out the door, and that's when he shot.

The last shot, I believe the last shot that caught the kid was when the kid hit the door. It has a metal—metal bar in the middle, so he hit the door and turned around and that's – that's how you found him, when they found him he was on his back.

Q. [The Commonwealth]: How many shots did you hear?

A. [Gomes]: I believe it was three, maybe four. You know, … it was pretty fast ….

*Id.* at 134-35. Gomes expressly testified that he never saw Randolph with a gun or weapon. *Id.*

Regarding the placement of the spent shell casings, Commonwealth expert witness Sergeant Kurt Joseph Tempinski ("Sergeant Tempinski") testified as follows:

> Q. [The Commonwealth]: … [I]s there any way to determine[,] does a casing just immediately fall to the ground or does it shoot a mile away, or is it just a random event?
>
> A. [Sergeant Tempinski]: It's fairly random, depending on the firearm and the type of cartridge, the height of the shooter, the altitude of the firearm, whether it's held sideways, upright, it just depends. The ejection port, usually in most firearms, in this particular case, the ejection port is on the right-hand side. The cartridge casings would, if held in the traditional manner, would go to the right and usually slightly to the rear—usually.
>
> Q.: All right. So they are ejected to the right and slightly to the rear, and then they just go wherever gravity and their force takes them?
>
> A.: That's correct. They can strike objects, they can hit things, they can be kicked or stepped on, whatever. But usually, in this particular case, to the right and maybe slightly to the rear of the firearm.

*Id.* at 161-62.

Contrary to the trial court's finding, the location of the spent shells did not render Gomes's testimony a physical impossibility. While Sergeant Tempinski testified as to a general direction that spent shells could be ejected from a firearm, he also stated that the location of the shells could be "fairly random." *See id.* The trial court's rejection of Gomes's testimony, based upon its application of the "incontrovertible physical facts rule," is

simply not supported in the record. As such, the trial court erred in relying upon this rule to reject Gomes's testimony.

In its Opinion, the trial court also found that the Commonwealth's evidence did not disprove Gesslein's claim of self-defense beyond a reasonable doubt. Trial Court Opinion, 12/20/13, at 14-15. According to the trial court,

> [t]he most compelling evidence is that no one saw [] Randolph with a gun with the exception of [] Gesslein, and a gun was not recovered. **However, even that evidence is diluted by the crowd that surrounded his body and the ease to which the gun could have been removed. Moreover, if he possessed a gun, it was secreted and literally only visible for seconds.**
>
> [] **Gesslein's version of events is substantially corroborated by the Commonwealth's evidence, and is more compelling**. The video outside the Club demonstrates [] Randolph's aggressive actions up to and including his blitz into the Club. Commonwealth witnesses also support [] Gesslein's testimony that [] Randolph was hurling invectives. Moreover, the gunshot to [] Randolph's "right lower abdominal quadrant" is consistent with where [] Gesslein testified that [] Randolph reached for the "black handle of a gun."

*Id.* at 16 (emphasis added, footnote omitted).

In order to create mutually inconsistent inferences, the trial court relied upon the testimony of Sergeant Conjuor. The trial court opined,

> Sergeant [] Conjuor was one of the initial officers who responded to the Club after the shooting. She observed [] Randolph on the ground at the foot of the stairs to the door of the Club. A large crowd had gathered in the parking lot behind the Club, which she described as "generally hostile to the police." Police personnel were needed to "get the crowd back" so EMS could provide assistance to [] Randolph. Her entire shift responded[,] which included fourteen (14) other officers. She encountered no

cooperative witnesses, and her inquiries were met by "expletives."

Two equally reasonable and mutually inconsistent inferences can be drawn from these set of circumstances. [] Randolph either did not possess a firearm, or in the morass of hostility, the firearm was spirited away….

*Id.* at 12 (footnote omitted).

Upon reviewing the record, we conclude that the trial court's above-stated finding is speculative, at best, and not supported by the evidence. The record reflects that, other than Gesslein, no witness observed Randolph with a firearm before, during or after the shooting. Further, no witness testified about observing a firearm near Randolph's body, or about secretive or suspicious activity engaged in by members of the gathered crowd.

Sergeant Conjour testified that she was dispatched to the scene of the shooting, and was the second or third officer to arrive at the scene. N.T., 4/1/13, at 73, 75. According to Sergeant Conjour, she stayed to secure the scene, and seek witnesses. *Id.* at 80. Sergeant Conjour offered no testimony that would support a finding that members of the crowd engaged in any suspicious or secretive activity, or in any way interfered with the integrity of the crime scene.

Allentown Police Detective Keven Mriss ("Detective Mriss") testified that he was called to the scene of the shooting to take charge of the scene and to collect evidence. N.T., 4/2/13, at 9. At the time of his arrival, the crime scene area had been established and there was an officer at every

entrance. *Id.* Detective Mriss testified that other than Gesslein's firearm and holster, no other firearm or holster was collected by the police from the Club or the crime scene. *Id.* at 44.

Jones testified that he entered the Club at about 2:00 or 2:30 A.m. on the night of the shooting. *Id.* at 64-65. Jones testified that those entering the Club are searched for weapons. *Id.* at 67. Jones testified as follows regarding the shooting:

> [Jones]: … [A]s I was sitting there talking to my friends, I was looking facing forward, and I was sitting there talking to one of my friends that was standing next to me. And at some point you heard [Smith] yell—start yelling, and then the scuffle took place. And at that point[,] you see the security guard; he backed up from that location to almost like the edge of the pool table right here in this area.
>
> …
>
> And at that point I stood up, when I heard all that commotion going on, to see what was going on. And at that point is when [Gesslein] drew his gun and fired three shots.
>
> Q. [The Commonwealth]: When the security guard backed up …, what were the people doing that were closer to the door?
>
> A.: Well, at that point at the door I seen [*sic*] … the three people, one of them being the deceased and two of his friends, they were running to—running out of the door.
>
> …
>
> Q.: … So, where were [Randolph] and his friends, you said they were near the door, what were they doing when the shots went off?
>
> A.: When the shots went off they were running out of the door, which one the—one of his friends was in the front, [Randolph]

was in the middle, and another—the last friend was behind [Randolph].

Q.: Now, you said you heard three shots?

A.: Yes.

Q.: And all three shots occurred as you described [Randolph] and his friends running out [of] the door?

A.: Correct.

Q.: At any point prior to the scuffle, or even during the scuffle, did you see [Randolph] or his friends—did you see them with a gun?

A.: No, I didn't.

Q.: At any point prior to or during the scuffle[,] did you see them reaching for or trying to reach for something, or trying to reach for a gun?

A.: No, I didn't.

*Id.* at 70-72.

Kelly testified that while in the parking lot at the Club, she heard "verbal arguing back and forth." *Id.* at 104. Kelly testified that after she entered the Club, the arguing continued. *Id.* at 105. Immediately after the shooting, Kelly stated that she exited the side door of the Club and returned from around the building to the parking lot. *Id.* at 106. At that time, Kelly observed Randolph lying on the parking lot, about five feet from the steps. *Id.* at 107. Kelly performed CPR on Randolph. *Id.* at 108. Kelly did not testify that she saw a weapon on or near Randolph, or that the crowd removed evidence from the scene.

Allentown Police Officer Michael Becker, Jr. ("Officer Becker"), testified that he was the first officer to arrive at the scene of the shooting. N.T., 4/1/13, at 86-87. Upon his arrival at the scene, Officer Becker observed a crowd in the area, and a female holding a rag or t-shirt to Randolph's stomach. *Id.* at 87. At that time, Officer Becker testified, about twenty to twenty-five people were outside the Club. *Id.* at 104. Upon the arrival of more police officers at the scene, Officer Becker proceeded inside the building. *Id.* at 88. Officer Becker offered no testimony that would support a finding of suspicious activity by any member of the crowd, or interference with the integrity of the crime scene.

By contrast, Gesslein's testimony contradicts the testimony of the other witnesses. Gesslein testified that the evening before the shooting, at about 3:40 a.m., he saw Randolph sitting on the pool table at the Club, "swinging his legs, with … two women, one on each side of him, with a beer bottle in his hands[,] swinging his legs [and] spilling beer on top of the table." N.T., 4/3/13, at 95. According to Gesslein, the owner of the Club directed him to get Randolph off of the pool table. *Id.* Gesslein stated that as he directed people to leave the Club at closing time, Randolph

> started screaming obscenities and profanity at me that he was going to do what he wanted when he wanted, and that's when he started swinging his beer bottle in his hand, in a clubbing motion.

*Id.* at 96. However, Gesslein testified that Randolph did not strike him. *Id.*

- 14 -

Smith, the President of the Club, contradicted Gesslein's testimony. Smith testified that Randolph was not at the Club the prior evening. N.T., 4/2/13, at 95. On the night of the shooting, Smith testified, Randolph "got pushy a little bit, like physically at [Gesslein and the other security guard], though no fighting or anything." *Id.* at 95. When asked to describe Randolph's actions, Smith testified as follows:

> Well, [Randolph] pushed his way through the guard to get between the door and the table. He shouldn't been [*sic*] in the Club at all, but he was like in the entrance.

*Id.* at 97-98. Smith stated that at his request, Gesslein told Randolph that he could not enter the Club. *Id.* at 98. According to Smith, the conversation between Smith and Randolph was "medium" in volume, and he heard no threats. *Id.* Smith testified that Randolph "did point his finger at me and said, 'I pay my ten dollars every night, and you're going to let me in or else.'" *Id.* at 99. Concerned, Smith walked away from the door in order to lock up the cash receipts. *Id.* Smith did not see the shooting, but heard shots being fired. *Id.* at 92.

Our review of the record also discloses testimony that, on April 29, 2012, police officers conducted and recorded two interviews of Gesslein. *Id.* at 190. The first recorded interview was played for the jury. *Id.* at 190-91. Allentown Police Detective Timothy Salgado ("Detective Salgado") testified that after the first interview, he viewed the recording of the incident, taken from the parking lot security camera. *Id.* at 192. After viewing that video,

Detective Salgado decided to re-interview Gesslein. *Id.* Detective Salgado testified that

> I had concerns with [what] the video depicted and what his account of the story of what happened was.
>
> …
>
> [Gesslein's] statement that [] Randolph's friends ran out the door, that [Randolph] stopped on the outside cement step outside the door and then turned to face him and went to draw a gun. I did not see that on that video.
>
> …
>
> [Gesslein's] statement was that the friends, which I believe are these two folks [indicating], two gentlemen right here, are outside—actually, he said three of them ran out, three of the friends ran out. And that [] Randolph, who is here in the white hat, was the last person out and stopped on the stoop.
>
> But the video shows the two friends in front of [] Randolph, and as the video will progress[,] there will be another friend that comes out behind him. At no time in this video did I see [] Randolph stop on that stoop and turn back in towards the Club.

*Id.* at 193-95. Detective Salgado testified that in the first interview, Gesslein stated that Randolph stopped, turned to face Gesslein, then "reached deep." *Id.* at 195.

By contrast, at trial, Gesslein testified that he recognized Randolph as "the gentleman who was sitting and causing a scene on the pool table the night before." N.T., 4/3/13, at 24. Gesslein then testified as follows regarding the shooting of Randolph:

> [Gesslein]: A gentleman, I can't tell you who … knocked on the door approximately 3:00 [], a minute before—a minute after,

and like I said, there is no way of seeing through the door, there is no glass, there's no cameras. We had to open the door and tell him that's it, 3:00[], place is closed. He said he knew [Smith], knew him, Jackie, [Smith's] daughter. It turned out to be [] Gomes.

He stuck his head around the door, [Smith] knew him, Jackie, [Smith's] daughter. I turned around and told [Smith], "I'm going to sign him in, if he gets here a couple of minutes late, let him in."

When that had happened, [] Randolph flung the door out of my hand, him and his three friends that he was with, bum rushed through the door.

…

Q. [Defense counsel]: No, you said they bum rushed their way in, what do you mean by that?

A. [Gesslein]: A quick blitz. I'm sure many people on the jury watch football, a pile on. They just—the four of them just ran right into the doorway, flung the door open and ran in.

Q.: Okay. Where were you when that happened?

A.: I was inside the Club.

Q.: Right at the door?

A.: Well, not at the door, about four or five feet back from the doorway.

Q.: Well, when … [] Gomes came in, did the door not shut?

A.: It pretty much was on its way to closing, it was pulled out of my hand.

Q.: Now, you saw the video that the Commonwealth showed earlier?

A.: Yes, I did.

Q.: Okay. And the gentleman who you were referring to as [] Randolph, is he the one that's banging on the door?

A.: Yes, he is.

Q.: And is that just before he entered?

A.: Yes.

Q.: And you say you're about four or five feet inside the Club when he enters, is that right?

A.: Yes.

Q.: What do they do?

A.: They come into the Club, I put my arms out in a T-motion and tell them, "Guys, you gotta get out."

I absolutely tried to put my hands across their chest just to try to coax them out. And that was the end of that.

Q.: Okay. What happened then?

A.: [] Randolph grabbed my right arm; he started on my forearm, locked down on my wrist. The other gentleman grabbed my left arm, grabbed me by my fleece, tried doing what I call the hockey maneuver, which is pulling it over my head, punched me on the left side of my head and now I'm fighting.

Q.: Okay.

A.: It was a physical fistfight.

Q.: And there's two people that have a hold of you?

A.: Yes.

...

Q.: Were you able to extricate yourself?

A.: Eventually, yes.

Q.: Okay. How long did it take?

A.: It could have been a minute, it could have been twenty seconds. I can't tell you.

Q.: All right. And you were able to get away from these two individuals?

A.: Yes.

Q.: When you did that, what were they doing?

A.: They were still coming at me.

Q.: Okay. Where did you go?

A.: I backed up.

…

Q.: After you were able to get away from these two individuals who were holding you, where did you go?

A.: I backed up.

Q.: How did you do that?

A.: I fought—I fought with everything I had, it was a two on one fight. I was—I thought I was going to die.

Q.: You were afraid?

A.: I was scared. You know, you got two—two young men that are grabbing your arms and they're whacking you, they're beating on you, what else are you supposed to do? You fight.

…

Q.: And how far away from [them] did you go …?

A.: The altercation happened right around here, about five feet in. I backed up to my right and I ended up right around here, to the back end of the pool table.

…

Q.:  … [S]o, you're about eight to ten feet away from them at this point?

A.:  Yes, from the original spot.

Q.:  Okay.  Now, can you tell the members of the jury, please, what happened after you got away from them and backed up, what did you see?

A.:  I seen [*sic*] [] Randolph taking his right hand reaching into the front of his waistband.  Underneath his shirt he wore his sweatshirt, tee-shirt mix out, un-tucked from his pants.

Now, mind you, when they bum rushed the door they weren't patted, they weren't searched.  When he reached into his waistband, as his hand was coming up, I seen [*sic*] the black handle of a firearm.  I was not going to worry about getting shot first, I drew my weapon and – that's why we're here.

N.T., 4/3/13, at 30-37.

After firing his weapon, Gesslein described what next transpired as

follows:

I worried about the people that were directly around me, as you are trained to do.  You discharge your weapon, you check your left, your right real fast, make sure there are no other threats.

I went to the door, I did not know if I hit [] Randolph or not.  I don't know if my three shots went through the door, I don't know as they ran did they go out of an open door, hit one of the vehicles in the parking lot, hit the brick wall.

I opened the door, peeked outside, seen [*sic*] him laying there, re[-]safetied [*sic*] my weapon, put it back on my side, called the cops.

- 20 -

*Id.* at 39-40. Gesslein admitted that, in contrast to his above-testimony, the video showed him running out of the door, and stated that "I should have known better than to just run out." *Id.* at 40.

On cross-examination, Gesslein clarified that upon breaking free of Randolph and his friend, Gesslein retreated somewhere between ten and fifteen feet. *Id.* at 93. According to Gesslein, he then took "a stance," with his gun pointed at the ground and the safety still on. *Id.* at 94-95. It was at this point, Gesslein testified, that Randolph reached for what Gesslein believed was a weapon. *Id.* at 94.

Thus, the jury was able to observe Gesslein's description of the events during his first two interviews with police officers and Gesslein's testimony at trial. In addition, the jury viewed the surveillance video captured by a camera outside the rear door to the Club. N.T., 4/2/13, at 48. Finally, the jury heard the testimony of the witnesses to the events leading up to, during and after the shooting. The jury, in passing upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence. *Commonwealth v. Laird*, 988 A.2d 618, 624 (Pa. 2010). The trial court erred in substituting its credibility determinations for those of the jury.

The trial court also improperly assigned weight to the lack of testimony by any of Randolph's friends who had entered the Club with him. *See* Trial Court Opinion, 12/20/13, at 13 (stating that "[n]one of []

- 21 -

Randolph's 'friends' who bolted inside the Club were presented as witnesses."). However, "even the uncorroborated testimony of a prosecution witness may be sufficient to convict despite contrary evidence from the defense, if the trier of fact, based on the evidence before it, chooses to lend credibility to the former." *Commonwealth v. Zankowski*, 546 A.2d 1254, 1256 (Pa. Super. 1988).

Based upon our review of the record, we conclude that the trial court erred in determining that the verdict was against the weight of the evidence. Accordingly, we reverse the trial court's Order granting a new trial to Gesslein.

The Commonwealth next claims that Judge Steinberg erred in not granting its Motion to recuse him from further proceedings involving Gesslein. Brief for the Commonwealth at 17. The Commonwealth summarizes instances wherein, the Commonwealth asserts, Judge Steinberg's conduct cast doubt upon his impartiality in rendering further decisions in the case. *See id.* at 17-42.

Our standard of review for a denial of recusal is well-settled.

[Our Supreme] Court presumes judges of this Commonwealth are honorable, fair and competent, and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice. The party who asserts a trial judge must be disqualified bears the burden of producing evidence establishing bias, prejudice, or unfairness necessitating recusal, and the decision by a judge against whom a plea of prejudice is made will not be disturbed except for an abuse of discretion.

***Commonwealth v. Kearney***, 92 A.3d 51, 60 (Pa. Super. 2014) (citations

and internal quotation marks omitted).

> [A] trial judge should recuse himself whenever he has any doubt as to his ability to preside impartially in a criminal case or whenever he believes his impartiality can be reasonably questioned. It is presumed that the judge has the ability to determine whether he will be able to rule impartially and without prejudice, and his assessment is personal, unreviewable, and final. Where a jurist rules that he or she can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion.

***Id.*** (citations and internal quotation marks omitted).

At the hearing on the recusal Motion, Cynthia A. Quadro ("Ms.

Quadro"), the presentence investigator, testified as follows:

> [F]irst of all, when we were first assigned to do the presentence investigation, Judge Steinberg contacted Sharon Shoemaker and indicated that he would like to discuss the matter with the presentence investigator. He did not know that I was assigned to the case at that time.
>
> I contacted Your Honor [and] indicated that I would like to interview [Gesslein] first before I met with you at that time. After I interviewed [] Gesslein, then we met in your chambers and we had a discussion about the case.
>
> …
>
> … And I believe during the course of the conversation[,] it was discussed, "Would you like to see the video?" or maybe, "Had you seen the video? It was my understanding that it was the same exact video that was on The Morning Call website. And I was not able to click on that website for whatever reason, maybe [restrictive software] or we're precluded from witnessing videos, video streaming via the County.
>
> So[,] I was not able to see that on The Morning Call website. So[,] during the course of the conversation, I believe it

was suggested, "Do you want to see the video?" and I said, "Yes, of course."

N.T., 9/3/13, at 27-28. Ms. Quadro testified that Judge Steinberg did not "instruct" her to view the videotape. *Id.* at 32. While in Judge Steinberg's chambers, Ms. Quadro and Judge Steinberg viewed a video taken from outside of the Club, and attempted to view rap videos made by the victim. *Id.* at 33. Ms. Quadro expressly testified that Judge Steinberg issued no direction to her to refrain from making a sentencing recommendation. *Id.* at 29-30.

Upon our review of the record, we cannot conclude that the trial judge abused his discretion in denying the Commonwealth's Motion to recuse. The trial judge's conduct throughout the trial reflected no bias or appearance of impropriety. Although we have reversed the trial court's grant of a new trial, the record does not support overturning the trial court's denial of the recusal Motion at this time.

Accordingly, we affirm the trial court's denial of the Commonwealth's Motion to recuse, and reverse the trial court's Order granting a new trial. However, upon reversing the grant of a new trial, we must address whether the mandatory minimum sentence imposed by the trial court, pursuant to 18 Pa.C.S.A. § 9712, resulted in an illegal sentence. *See Commonwealth v. Watley*, 81 A.3d 108, 118 (Pa. Super. 2013) (recognizing that the Court may review the legality of a sentence *sua sponte*, and that the application of

a mandatory minimum sentence may give rise to illegal sentence concerns, even where the sentence is within the statutory limits).

Pursuant to section 9712(a), the possession of a firearm, during the commission of a voluntary manslaughter, is considered to be a sentencing factor to be determined by the trial court upon a preponderance of the evidence, and not an element of the underlying crime to be determined beyond a reasonable doubt. 18 Pa.C.S.A. §§ 9712(a), (b); 9714(g). This sort of sentencing scheme was deemed unconstitutional in **Alleyne v. United States**, 133 S.Ct. 2151, 186 L. Ed. 2d 314 (2013). **See Watley**, 81 A.3d at 117 (stating that in **Alleyne**, the United States Supreme Court "rendered those Pennsylvania mandatory minimum sentencing statutes that do not pertain to prior convictions constitutionally infirm insofar as they permit a judge to automatically increase a defendant's sentence based on a preponderance of the evidence  standard"); **see also id.** at 117 n.4 (specifically referencing, *inter alia*, 18 Pa.C.S.A. § 9712).

In **Commonwealth v. Newman**, 99 A.3d 86 (Pa. Super. 2014), this Court made it clear that following **Alleyne**, "it is manifestly the province of the General Assembly to determine what new procedures must be created in order to impose mandatory minimum sentences in Pennsylvania...." **Newman**, 99 A.3d at 102. Accordingly, the **Newman** Court concluded that the entire mandatory minimum sentencing statute, set forth at section 9712, is unconstitutional. **Id.** at 103; **accord Commonwealth v. Valentine**,

- 25 -

2014 Pa. Super. 220, *23.  We therefore reverse Gesslein's judgment of sentence and remand for resentencing without consideration of 18 Pa.C.S.A. § 9712.

Order affirmed in part and reversed in part; judgment of sentence vacated; case remanded for resentencing consistent with this Memorandum; Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2014